### In re EL PASO REFINERY, L.P., Debtor.

### Andrew B. KRAFSUR, Trustee, Plaintiff,

v.

### UOP, Defendant.

### Bankruptcy No. 94–30051–LMC.
### Adversary No. 95–3026.

United States Bankruptcy Court, W.D. Texas, El Paso Division.

April 19, 1996.

---

62

Kyung S. Lee, Verner, Liipfert, Bernard, McPherson and Hand, Chartered, Houston, TX, for Chapter 7 Trustee.

Peter J. Riley, G. Martin Green, Thompson & Knight, Dallas, TX, for UOP.

## DECISION

LEIF M. CLARK, Bankruptcy Judge.

**CAME ON** for consideration the Trustee's First Amended Complaint objecting to the claim of the Defendant, UOP. The Trustee's first count alleges that UOP's claim should be disallowed because it has already been satisfied. The Trustee's second count was previously denied at summary judgment on grounds that the Trustee lacked standing to bring the claim. The Trustee's third count requests damages for an alleged breach of contract by the Defendant, UOP. The fourth count requests equitable subordination of UOP's claim.

## FACTUAL SUMMARY:

The instant dispute arises from licensing agreements between the Defendant, UOP, and the Debtor, El Paso Refinery, L.P. ("L.P."). UOP is in the business of developing and licensing petroleum refining technology. The Debtor owned and operated a petroleum refinery.

The Debtor and/or its predecessors in interest executed certain non-exclusive licenses which allowed the Debtor to use certain UOP patents and technologies (collectively, the "Licenses" or "Licensing Agreements").

On October 23, 1992 the Debtor filed for voluntary Chapter 11 relief. The Trustee filed this adversary proceeding, objecting to UOP's claim and seeking certain affirmative relief. At trial, the parties stipulated that the amount of UOP's claim is $4,019,028.36, subject to being reduced by this objection. As one of the largest unsecured creditors, UOP was asked by the United States Trustee to serve on the Unsecured Creditors' Committee (the "Committee"). The Committee was appointed on October 30, 1992. UOP agreed to serve on the Committee and participated in the Committee's activities.

On December 3, 1992 the court appointed an examiner in the Debtor's Chapter 11 case. The examiner concluded that the Licenses had a value of approximately $2 million, however the Debtor's original schedules had not listed the Licenses as assets of the Debtor. The Debtor filed amended schedules on December 31, 1992. The amended schedules listed the Licenses as an asset with an approximate value of $2 million.

### Refinery Operation:

Pursuant to an order dated May 4, 1993 the Debtor's Term Lenders foreclosed upon the "Refinery Assets." The Term Lenders then conveyed ownership of the refinery to a newly formed holding company, Refinery Holding Company, L.P. ("RHC"). RHC in turn entered into an operating agreement with Chevron USA ("Chevron") to have Chevron operate the refinery on behalf of RHC. Although the parties dispute exactly when UOP became aware of Chevron's involvement, at some point, UOP learned that portions of the refinery were in fact being operated, which necessarily involved the continued use of UOP technology. Based on UOP's belief that neither Chevron nor RHC had a valid license to use the technology, UOP contended that the continued operation of the refinery violated UOP's intellectual property rights.

UOP did not take any affirmative steps to stop RHC and Chevron from operating the refinery, but did advise RHC that it believed the operations were in violation of UOP's patent rights and insisted that RHC remedy the situation. Subsequently, UOP entered into negotiations with RHC and Chevron regarding the licensing issue. The negotiations resulted in, according to UOP, new licenses for operation being sold to RHC/Chevron, though the testimony indicates that a significant consideration for UOP was the outstanding liability still owing on the L.P. Licenses. The Trustee maintains that the money UOP ultimately received from RHC/Chevron represents either cure of the L.P. Licenses, or should be applied in mitigation of UOP's claim against L.P.

## TRUSTEE'S COUNT ONE:

Trustee's Count One seeks a declaratory judgment that UOP must apply the $3.7 million it received from RHC for the "new" licenses in mitigation of UOP's claim for unpaid royalties against the estate. Both parties stipulate that UOP has a valid claim in the total amount of $4,019,028.86.[1] The Trustee believes that the $3.7 million UOP received for selling licenses to RHC ought to be credited against the unpaid royalty claim of UOP against L.P.

UOP's claim for unpaid royalties against the L.P. estate is essentially one for breach of contract. L.P. had contracted with UOP for the right to use certain UOP technologies in L.P.'s refinery operation. It is undisputed that L.P. is in breach of the Licenses for failure to make royalty payments. The ques-

---

1. UOP's claim is actually made up of two components: a claim for unpaid royalties on the L.P. Licenses in the amount of $1,970,037.38, and a claim for pre-petition goods and services (including the construction of the Butamer unit) in the amount of $2,048,990.98.

tion before this court is the extent to which UOP has been damaged by L.P.'s breach.

■ The Trustee first argues that UOP's claim has been satisfied or cured by the $3.7 million received by UOP from RHC on account of the RHC Licenses. UOP counters by arguing that the RHC Licenses were "new" licenses unrelated to the L.P. Licenses. That is, both UOP and RHC intended for the RHC Licenses to be new licenses and not simply a cure or assignment of the old L.P. Licenses. As further support UOP points out that the agreements were not identical and that the RHC Licenses grant RHC valuable rights that were not contained in the L.P. Licenses.[2]

While it is true that a vendor's subsequent sale of a new and *different* product would not diminish the vendor's damages caused by an earlier buyer's breach, in this context, UOP's argument is *off the mark*. Although the rights granted to RHC were not identical to the rights granted under the L.P. licenses, they were so similar that they ought not be considered to be a *different* product. UOP is in the business of selling refinery related technology licenses and the licenses sold to RHC covered mainly the same processes as the L.P. Licenses.[3] By analogy, UOP would be correct in arguing that a vendor selling a boat and a car, who contracts with BuyerA to purchase the car, has not mitigated his damages if subsequent to BuyerA's breach, the vendor sells the boat to BuyerB. However, if the vendor subsequently sells the car to BuyerB his damages from BuyerA's breach are lessened, even if the vendor had to install a sun roof in order to induce BuyerB to make the purchase. UOP may have added some

bells and whistles, but it re-sold essentially the same "car" to RHC.

However, concluding that UOP resold the same car does not decide whether UOP's claim against L.P. was satisfied by the RHC sale. UOP makes two additional arguments. First, UOP claims that they are under no duty to mitigate their damages. Second, UOP argues that even if they did resell the same "car", their damages were not reduced because they have an unlimited supply of "cars," *i.e.*, licenses.

■ UOP's argument that they had no duty to mitigate their damages misstates the doctrine of mitigation. The term "duty to mitigate" refers to an affirmative defense to a claim for damages.[4] For example, when a tenant is sued by his landlord for failure to make rent payments, the landlord, before pursuing the tenant, has an affirmative duty to take reasonable steps to re-let the leased property. *See Snyder v. Ambrose*, 266 Ill. App.3d 163, 203 Ill.Dec. 319, 639 N.E.2d 639 (1994). The landlord cannot do nothing and simply sue the tenant for the remaining rent. *Id.*

In the instant case though, whether UOP had a *duty* to mitigate its damages is not the question before the court. The question rather is whether the sale of licenses to RHC in fact *did* mitigate UOP's damages. This is really just another way of asking whether UOP is a lost volume seller. If UOP is a lost volume seller, then the sale to RHC did nothing to mitigate UOP's losses from L.P.'s breach. On the other hand, If UOP is not a lost volume seller, then the court must determine to what extent UOP has already re-

---

2. According to UOP, "RHC has no refinery operations, no refinery operational experience and no employees. Therefore, it was critical to RHC that it obtain rights from UOP in addition to the rights the Trustee asserts he could have assigned under the [L.P.] Licenses. Had these additional rights not been important, RHC, a sophisticated commercial entity with first-rate legal counsel, would have simply paid the approximate $2,000,-000 arrearage Tim Bennett believed was necessary to utilize the [L.P.] Licenses. Instead RHC paid an additional $1,000,000 to obtain new Licenses from UOP, which granted RHC the precise rights it required." UOP Post–Trial Brief at 3 (internal citations omitted).

3. *I.e.* the Butamer Process Unit, the Merox Process Units (including the FCC gasoline Unit, and the jet fuel/kerosene Unit) and the Fluid Catalytic Cracking Process.

4. It is actually incorrect to even refer to it as a *duty* on the part of a seller. *See, Wired Music, Inc. v. Clark*, 26 Ill.App.2d 413, 168 N.E.2d 736 (1960) ("It is inaccurate to say that plaintiff has a 'duty' for if he breaches the 'duty' by failing to mitigate damages, he incurs no legal liability. The law does not assess damages against him, it just fails to compensate him for any injury he reasonably could have avoided") (QUOTING THE RESTATEMENT OF CONTRACTS, § 3336 Comment d).

couped the loss it suffered due to L.P.'s breach.

### Lost Volume Seller

■ The normal measure of damages for breach of contract is the contract price minus the resale price. The idea is that the seller is made whole or has received the benefit of his bargain if the breaching party simply makes up the difference in price between what the seller expected to receive from the breaching party, and what the seller actually received from the new buyer.

■ A lost volume seller is not bound by the traditional damage calculation of contract price minus resale price because such a calculation would not adequately recompense it for its true loss. That is, it would not give the non-breaching party the benefit of his bargain, since, absent the buyer's breach, a lost volume seller would have earned profits from *two* sales rather than just one. The parties cite different cases which have announced varying tests for determining whether a given seller is a lost volume seller. The essential point of all the tests, however, is the same: a damage award for breach of contract, whether lost volume seller or otherwise, is intended to put the non-breaching party in as good a position as it would have been in had the breach never occurred. As an Illinois appellate court put it, "[t]he guiding rule and basic principle is that *compensation* is the general purpose of the law in fixing the measure of damages." *Wired Music, Inc. v. Clark*, 26 Ill.App.2d 413, 168 N.E.2d 736, 739 (1960) (emphasis added).

In *Wired Music*, the plaintiff provided a service whereby it would deliver music via the telephone lines to area businesses. The defendant was one such customer. Seventeen months into a three year contract with the plaintiff, the defendant moved his business and discontinued the plaintiff's music service. A new tenant moved into the office space abandoned by the defendant and began its own separate contract for the plaintiff's services. When the plaintiff sued to recover from the defendant the remaining amount due on the contract (nineteen months), the defendant asserted that the plaintiff's damages should be lessened by the amount received from its new client at the defendant's

old address. The court held for the plaintiff, finding that the plaintiff had been damaged in an amount equal to the profit it would have received had the defendant not breached.

■ UOP insists that *Wired Music* is controlling, and mandates that no mitigation occurred as a result of the sale of a license to RHC/Chevron. The Trustee counters that, because *Wired Music* was decided before the formal development of the lost volume seller doctrine in Illinois, reliance on it by this court would be misplaced. The Trustee argues that *Wired Music* only applied "the *first* prong of what would later become the lost volume seller analysis under Illinois law, as set out by the Seventh Circuit." Trustee's Post-trial Brief at 7 (underscoring in original); *see R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709 (7th Cir.1991). UOP responds by questioning the propriety of a federal court defining the "lost volume seller analysis under Illinois law." As UOP correctly points out, a federal court should follow an intermediate appellate level state court's judgment on an issue of state law unless the federal court is persuaded that the state's highest court would find otherwise. *See West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183–84, 85 L.Ed. 139 (1940). *Wired Music*, even though it is now well over thirty years old, is still reproduced in many casebooks used to teach the law of contracts to law students. It is very likely that the Illinois Supreme Court will follow *Wired Music* in future cases, and unlikely that that court would overturn it. Therefore, *Wired Music* should be accorded precedential value by the court in this case.

■ Although *Wired Music* does not use the term "lost volume seller" it does detail the essential rationale behind the doctrine. Simply put, even though a lost volume seller resells the same "car," the lost volume seller has not recouped his losses from the earlier breach. But for the breach, the lost volume seller would have earned profits from two sales instead of just one. The notion behind the *Wired Music, Case* and all other lost

**66**

volume cases, is that the non-breaching party is entitled to the benefit of his bargain.[5]

■ By the same token, the lost volume doctrine cannot be construed so broadly as to swallow up all other theories of contract remedies. *See* Alex Devience, Jr., *An Analysis of the Lost Volume Seller Doctrine Under Article 2 of the Uniform Commercial Code*, 97 COM.L.J. 198, 198 (Summer 1992); Comment, *Finding the Lost Volume Seller: Two Independent Sales Deserve Two Profits Under Illinois Law*, 22 J. MARSHALL L.REV. 363, 387 (Winter, 1988). To quote from the comment:

> If Illinois courts agree with the seventh circuit that lost-volume sellers are entitled to a profit remedy under Uniform Commercial Code section 2–708(2), they will face the difficult but necessary task of deciding which sellers are entitled to the remedy. Courts in other jurisdictions have too frequently permitted a profit remedy to undeserving sellers because previous lost-volume seller definitions were either inadequate or poorly applied. Because it comports with the general damages philosophy of the U.C.C. and produces results consistent with the general common law theory of contract damages, Illinois courts should adopt the two-step analysis of 'capacity' and 'wholly independent sales event' to ensure that the section 2–708(2) profit remedy is only available to true lost-volume sellers.

Comment, *supra.* The author of the comment cogently spells out a sensible decisional matrix for applying the lost-volume seller doctrine. He explains that a court ought first to ask about the capacity of the seller to demonstrate that it had excess manufacturing capacity or present ready access to additional inventory at the time of the repudiation or breach. This prong of the inquiry simply demands that the seller be able to demonstrate that it could have made a "second sale."

■ The second prong requires the court to answer this question: "Would the plaintiff have made a sale to the ultimate resale purchaser even if there had been no repudiation by the original buyer of the goods?" Comment, *supra* at 382. In other words, the original sale and the resale after breach must be wholly independent events, as opposed to the second sale being a mere replacement for the first sale. To make this determination, three important variables should be examined.

First, as to the seller, the court ought to determine that the breach of the original sale did not provide the opportunity to make the resale (establishing that the resale is not merely a replacement sale). Second, the court ought to examine the resale buyer's particular needs, in order to determine whether the resale buyer would have bought from the seller even if the original buyer had not breached. *See* Sebert, *Remedies Under Article Two of the Uniform Commercial Code: An Agenda for Review*, 130 U.PA. L.REV. 360, 388 (1981). Finally, the trier of fact ought to examine the characteristics of the particular goods involved in the breach and that the resale buyer ultimately purchased, keeping in mind that the more specialized the particular item, the more likely it is that its subsequent sale is merely a replacement sale. Comment, *supra* at 385.

In *Wired Music*, the "plaintiff [had] so far as the evidence show[ed], an unlimited supply of music *limited in its distributions only by the number of contracts which plaintiff can secure.*" *Id.* 168 N.E.2d at 738–39 (emphasis added). UOP wishes to analogize themselves to the plaintiff in *Wired Music*, and concentrates on the fact that they, like that plaintiff, have an unlimited amount of "product" to sell, *i.e.*, technology licenses. The difference is of course that the list of potential customers from whom UOP can secure contracts is significantly more limited than was the plaintiff's list of potential customers in *Wired Music*. UOP's capacity for resale is limited not only by the number of

---

**5.** "If Defendant's contention were adopted by this court, it would have the effect of denying to the plaintiff the benefit of his bargain. This case is not at all like the situation where a plaintiff has one house to rent or one car to sell or a fixed quantity of personal property or real estate. Here, plaintiff has so far as the evidence shows, an unlimited supply of music limited in its distributions only by the number of contracts which plaintiff can secure." *Id.* 168 N.E.2d at 738–39.

licenses it can grant but also by whether a given potential buyer has a refinery, and more specifically a refinery that needs this process in order to operate. The universe of refinery operators is considerably more circumscribed than is the universe of potential users of piped-in music.

The service provided by the *Wired Music* plaintiff was not only of unlimited supply, but also had a value to and could be marketed to practically anyone. The plaintiff's list of possible customers included every business connected to a telephone line. The new tenant would have been a likely customer even if the defendant had not moved, because whatever location the new tenant ultimately rented would likely have been connected to a telephone line. The plaintiff therefore was deprived of the opportunity to provide service to, and obtain profits from contracts with *both* the defendant and the tenant. Petroleum refining technology, unlike music piped in over telephone lines, is not particularly useful to anyone without a refinery. In order to be a potential customer of UOP, one must either own, operate, or soon plan to own or operate a refinery. *Wired Music* did not "explicitly reject[ ] any requirement that a party in UOP's position be required to grant a credit for the revenue from a subsequent transaction to the debt on a breached contract." UOP's Post–Trial Brief at 5. UOP is not in the same position as was the plaintiff in *Wired Music,* in terms of its capacity.

■■■ The essence of the *Wired Music* holding was that a non-breaching party deserves to be compensated for losses incurred attributable to another party's breach. This is not a new theory; it is the essential purpose of contract damages in all cases. All that *Wired Music* adds is that the usual rule used by courts to measure damages (*i.e.,* contract price minus resale price) would have been inadequate to compensate a true lost volume seller for its loss. *Wired Music* teaches that a court must look at the totality of the facts in a given case to determine whether, despite a subsequent sale, a plaintiff has still been damaged. To make this determination a court must analyze what would likely have happened had the breaching party not breached. As discussed above, if the defendant in *Wired Music* had not breached and abandoned the location, the plaintiff could have had contracts with both the defendant and the tenant at different locations. As that court put it, "[w]e are unable to say that the music sold in the location that defendant abandoned could not have been sold but for the breach of the defendant." *Id.* at 739.

■■■ In the instant case, by contrast, the RHC licenses could not have been sold *but for* L.P.'s breach. If L.P. had not breached and vacated the refinery, RHC would not even exist let alone own a refinery. The court is likewise unconvinced that UOP has been deprived of a second profit through the sale to some entity other than RHC. Unlike music traveling over telephone lines, the Licenses are unit-specific. UOP attempted to argue that, even if L.P. had not breached and was still operating the refinery, UOP could sell additional licenses to a second operator on the same units. The evidence in support of this point was, however, somewhere between thin and nonsensical. Although it may be theoretically possible to sell additional licenses on an El Paso unit that is already being operated, in reality it has not and would not happen, as UOP's representative himself acknowledged in his testimony.[6] The inescapable conclusion is that, if L.P. were still operating the El Paso refinery, UOP would not and could not have made an additional sale. L.P.'s breach eliminated one customer and created another. If L.P. had never breached, UOP would have received $1,970,037.38 in royalty payments from L.P.

6. The best UOP's witness could muster in support of the argument was the situation in which a license on a given unit was still *in force* but was not actually being used (perhaps because the operator had gone out of business or abandoned operations at the refinery). A subsequent operator of the refinery might then be sold a new license, resulting in two licenses being in place on the same refinery. To be a true loss volume seller, however, one would have to postulate *two* operators *both* operating the *same refinery* under different licenses *at the same time.* No operator with any common sense would ever permit another entity to operate its refinery at the same time, given the extensive risks and liability that would be involved. Indeed, UOP's witness knew of no such situation anywhere in the nation, either now or at any time in the past.

Instead, thanks to L.P.'s breach it has received $3,600,000 in royalty payments from RHC. Any loss UOP may have suffered because of L.P.'s breach has been more than mitigated by the sale to RHC—a sale UOP would not have made if L.P. had still been operating the refinery. UOP has thus not suffered a loss from L.P.'s breach of its duty to pay UOP for the L.P. Licenses and is therefore not entitled to maintain its claim against L.P. for unpaid royalties. To do so would amount to a double recovery for UOP.

This analysis conforms as well to the decisional matrix suggested in the Comment alluded to earlier. UOP's capacity is significantly delimited by its universe of buyers with refineries. Indeed, given that the licenses are unit-specific, the "second sale" of this license was limited to the El Paso Refinery itself. The resale to RHC fails to qualify as an "independent event" as well. But for the breach, RHC would not have existed and there would not have been a "second sale" to RHC. The opportunity to sell a new license to RHC was presented by L.P.'s breach of the original license (and subsequent bankruptcy which led to the foreclosure by the Term Lenders). The resale buyer had a particular need for a license on the El Paso Refinery, and did not need a license on any other refinery. Finally, the item "resold" was highly specialized—identified to the El Paso Refinery itself. Thus, the resale was not truly an independent event but rather a mere replacement of the prior sale to L.P.

■ The court is satisfied that the foregoing analysis is sufficient to explain why UOP's claim for unpaid royalties should be disallowed. However, the parties also cite to *R.E. Davis Chemical Corp. v. Diasonics, Inc.*, 924 F.2d 709 (7th Cir.1991), as an alternative analytical matrix. The *R.E. Davis* court held that, in Illinois, "in order to qualify as a lost volume seller, a plaintiff must establish the following three factors:

(1) that it possessed the *capacity* to make an additional sale,

(2) that it would have been *profitable* for it to make an additional sale, and

(3) that it *probably would have made* an additional sale absent the buyer's breach."

*Id.* at 711 (emphasis added).

*Davis* is not controlling precedent, given that it is but an attempt at extrapolation of Illinois law by a federal court. This court's discussion *supra*, examining the instant facts under the *Wired Music* analysis is nonetheless equally applicable under the *Davis* three part test.[7] This is so because that test in fact merely tracks the decisional matrix already laid out, *supra*.

UOP's "product" is a license to use its technology, and at least theoretically, UOP has an unlimited supply of such licenses. Yet, as explained above, the supply is not unlimited in fact. UOP *did not* have an unlimited supply of site-specific licenses.[8] On the second element of *Davis*, UOP has an easier time of it, as the major costs associated with technology licenses all are derived from the initial development of the technology. After the technology has been developed and patented the marginal cost of each new sale is negligible. Thus, any additional sale will likely be profitable.

UOP is unable to overcome the third prong of the *Davis* test—the *probability* that it would have made an additional sale but for L.P.'s breach. As noted in the discussion earlier under *Wired Music*, UOP was not deprived of an additional sale, and so has not been damaged. Similarly, under the *Davis* analysis, it cannot be said that UOP would probably have made an additional sale but for L.P.'s breach. Without a breach, RHC would not even have existed.

7. The parties seem to be under the misconception that the *Wired Music* court's analysis concentrated solely on the sellers capacity for additional sales (*i.e. Davis's* first prong). As discussed *supra*, upon a careful reading of *Wired Music* it is apparent that the court's analysis incorporated all of the factors enunciated in the three-part *R.E. Davis* test.

8. True, a license is just an agreement not to sue for infringement and UOP could agree not to sue an unlimited amount of entities for infringement. Still, the reality is that each license is tied to a specific unit, and each unit can produce only a finite amount of product. Therefore, there is a finite amount of licensing purchasers would be willing to buy.

UOP attempted to argue that the "second sale" that it lost as a result of the breach was the sale of a license to Chevron on *its* refinery next door to the El Paso Refinery. But that is not the "second sale" on which a court ought properly to focus when applying the lost volume analysis. Rather, the question is whether had there not been a breach, would UOP have sold a license to *RHC*, the resale buyer in this case. Chevron was a subsidiary licensee under RHC's license, with the consent of UOP, but was not the purchaser of the license.[9]

Moreover, a presumed "lost sale" to Chevron would not be a lost sale of the very license resold to RHC. The licenses sold by UOP were a unit-specific licenses on the El Paso Refinery. Such licenses would not have "worked" on Chevron's own plant. Indeed, Chevron already *owns* licenses on its own plant—from UOP. It would not have been a potential purchaser of a new license from UOP in any event.[10]

 Even if the court were to hold that an additional sale to Chevron was likely, UOP still would not be entitled to maintain its claim against L.P. for unpaid royalties as a lost volume seller. An aggrieved party is given lost volume status because, even after a subsequent sale, the party is still damaged and has not received the benefit of its bargain. The seller would be better off if the buyer had not breached. In the instant case UOP is better off *because* of L.P.'s breach. If L.P. had not breached, UOP would only have received the $1,970,037.38 remaining to be paid on the L.P. Licenses. Instead, because L.P. breached, they were able to negotiate a deal with RHC worth $3,700,000. Therefore, because of L.P.'s breach, UOP is $1,729,962.62 better off. Even were the court to find that, but for the breach, Chevron would have purchased additional licenses, there was no evidence whatsoever that Chevron would have purchased in excess of $1,729,962.62 worth of licenses.

The simple answer to this difficult question is that UOP is better off now than they would have been absent a breach by L.P. UOP has received the benefit of its bargain and more. That portion of UOP's claim consisting of past due royalties is accordingly disallowed.

### TRUSTEE'S COUNT TWO:

The court has earlier entered summary judgment in favor of UOP on this count. It requires no further discussion here.

### TRUSTEE'S COUNT THREE:

Trustee's Count Three alleges a breach of contract by UOP. UOP defends on three grounds: 1) that the Trustee lacks standing to assert the breach because the Debtor's interests in the Licenses were foreclosed; 2) that the Trustee lacks standing to assert the claim because the Licenses never became part of the estate; and 3) that the Trustee

---

9. UOP attempted to prove that, in fact, Chevron was also a "purchaser" of a license, but the totality of the facts demonstrate that Chevron instead made certain financial accommodations to UOP and RHC in order to "make the deal work." Its involvement in the transaction arose only from the serendipitous decision of RHC to hire Chevron to operate the refinery on its behalf. The licenses themselves were issued to RHC. UOP also relies on a "side letter" agreement between it and Chevron, which it maintains establishes that the "true sale" was to Chevron. But the most that can be said for the letter agreement was that it might make it easier for RHC to transfer the licenses without further concern that it a subsequent purchaser would have to go through with UOP what *it* did when it took over the refinery after the foreclosure.

10. The most that UOP can argue here is that Chevron might, at some point in the future, have elected to expand its volume under its license, requiring perhaps an "upgrade" of its existing license. There is no probative evidence in the record to determine what such an upgrade might cost, or whether Chevron would ever want to put such an upgrade into place. Chevron's refinery is fairly old, compared to El Paso Refinery, and an upgrade of capacity would cost more to Chevron than simply acquiring expanded licensing from UOP. Chevron would in all likelihood have to engage in an overall refinery modernization project costing tens of millions of dollars before it would ever be in a position to ask for any substantial increase in licensing capacity. Above and beyond the unlikelihood of Chevron's engaging in such a project any time soon, the evidence on the point is speculative at best. Moreover, given the way in which the lost volume doctrine operates, there is considerable doubt that such evidence would even be relevant.

**70**

cannot, as a matter of law, establish a claim for breach of the Licenses.

### Lack of standing because the Licenses were foreclosed upon.

■■■ UOP asserts that the foreclosure order is unambiguous and therefore parole evidence should be excluded. The Trustee's position is that the foreclosure order is unclear and parole evidence would show that the licenses were not foreclosed upon. At trial, the court allowed the parties to present parole evidence, which indicated that, depending on the state of negotiations, all parties concerned took conflicting positions as to whether L.P.'s interests in the Licenses were or were not included in the foreclosure. A close examination of the operative documents in light of the evidence confirms, however, that UOP's interpretation is correct. The Licenses were foreclosed by the Term Lenders.

The granting clause of the Term Lenders' Mortgage, Deed of Trust, Security Agreement, and Financing Statement (the "Security Agreement") states as follows:

> As used in this [Security Agreement], the term *"Mortgaged Property"* shall be expressly defined as meaning all of Mortgagor's rights, title and interests and estates in the following described real and personal property, whether now or hereafter acquired:
>
> . . . . .
>
> (f) all rights now owned or hereafter acquired by Mortgagor with respect to all assignments of interest, contracts, rights-of-way, leases, servitudes, privileges, permits, *licenses,* easements, tenements, hereditaments, improvements, appurtenances and benefits now existing or in the future obtained. . . .

*Security Agreement* at 2. (italics added).

The Term Lenders therefore, pursuant to the Security Agreement had a security interest in the L.P. Licenses and the ability to foreclose the Debtor's interest therein. On April 19, 1993, the court entered its Order Granting Joint Application to Compromise and Granting Term Lenders' Motion for Relief from the Automatic stay to Proceed Against Property of the Debtor (the "Fore-

closure Order"). Pursuant to the Foreclosure order, the Term Lenders foreclosed upon all of the "Refinery Assets." Exhibit "A" of the Foreclosure Order defines the term "Refinery Assets" to include among other things:

> 4. all books, correspondence, credit files, records, computer programs, computer tapes, cards, customer lists in the possession or control of El Paso Refinery, L.P., *trademarks, licensing agreements, copyrights, patents and proprietary rights,* blueprints, . . . in connection with the use and/or operation of the Refinery Assets referred to in the other paragraphs of this definition;
>
> 5. all contracts, agreements, leases, or personalty and realty, easements, rights-of-way, *licenses and permits* that relate directly to the use and/or operation of the Refinery Assets and the Refinery's operations referred to in the other paragraphs of this definition . . .;
>
> 7. all general intangibles (as defined in the Uniform Commercial Code) that related directly to the use and/or operation of the Refinery Assets and the Refinery's operations . . .;

*Foreclosure Order,* Exhibit "A," pp. 1–2 (emphasis added).

Despite this clear language the Trustee maintains that the L.P. Licenses were excluded from the definition of Refinery Assets by the final paragraph of exhibit "A," which states, "Notwithstanding the foregoing *'Refinery Assets'* shall not include . . . any General Intangibles as defined in exhibit C hereto." (emphasis in original). Exhibit C to the Foreclosure order states:

> 3. All general intangibles of every nature, whether presently existing or hereafter acquired or created, all books, correspondence, credit files, records, computer programs, computer tapes, cards, customer lists, and other papers and documents in the possession or control of Debtor, claims (including without limitation, all claims for income tax and other tax refunds), choses in action, judgments, trademarks, *licens-*

*ing agreements, royalty payments, copyrights, patents, and proprietary rights,* trade secrets, service names ... and in any event all general intangibles within the meaning of Article 9 of the UCC, as to all of the foregoing whether now existing or hereafter acquired or created; *provided, however, that to the extent any of the foregoing relates to real estate, fixtures, machinery and equipment, it shall be excluded to such extent from the description of property and assets in this paragraph* (any and all of the foregoing not excluded by the last clause of this Paragraph (4) being the *"General Intangibles"*).

*Exhibit C ¶ 3* (italics added).

The definition of Refinery Assets in Exhibit "A" includes all licenses and general intangibles that relate to refinery operations. Exhibit "C" purports to exclude some general intangibles, but only those that do not relate to "real estate, fixtures, machinery and equipment." The evidence established that the L.P. Licenses were an integral part of the fixtures, machinery, and equipment used at the El Paso Refinery. Therefore, because the L.P. Licenses both related to refinery operations and the refinery's fixtures, machinery, and equipment, the L.P. licenses were included in the Refinery Assets that were foreclosed upon by the Term Lenders. The foreclosure extinguished any right, title, or interest the debtor had in the L.P. Licenses. *See, Barnett v. Maida,* 503 S.W.2d 610, 613 (Tex.Civ.App.—Beaumont 1973). Included in those interests was the right to sue for any cause of action arising out of the Licenses. Therefore, the Trustee lacks standing to bring a breach of contract claim against UOP.

Although the court has found that the Trustee lacks standing to pursue this claim, in the interest of a complete record, the court will also address UOP's second and third defense, though they are rendered essentially moot by the court's findings *supra* reducing UOP's claim by the amount still owing on the Licenses (as that is also the probable amount of L.P.'s damages for any alleged breach by UOP).

**Lack of standing because the Licenses never became part of the estate:**

 UOP relies on *Tonry v. Hebert* for the proposition that the Licenses were never part of the bankruptcy estate, and thus, the Trustee lacks standing to bring an action asserting that they were breached. *Tonry v. Hebert,* 724 F.2d 467 (5th Cir.1984). The precise language in *Tonry* that UOP relies on is, "[u]nlike other assets of the debtor, the interest in an executory contract does not automatically vest in the bankruptcy estate at the time of filing. That status only attaches upon the trustee's assumption of the executory contract." *Id.* at 469.

 At issue in *Tonry* was whether a Debtor attorney's contingent fee contracts were part of the bankruptcy estate. The Fifth Circuit held that the contingent fee contracts were non-assumable personal service contracts, and that, as such, they can never become part of the estate. The Fifth Circuit did not hold that a trustee cannot sue for breach of an unassumed executory contract. Such a ruling would mean that non-debtors could unilaterally terminate executory contracts immediately upon filing with impunity. That is not the law. Pending the debtor's assumption or rejection of *an assumable* executory contract, the non-debtor is bound by the contract's terms. *See e.g., Public Service Co. v. New Hampshire Elec. Co-op.,* 884 F.2d 11, 14 (1st Cir.1989) ("Ordinarily, the debtor need not commit itself to assumption or rejection of such a contract until a reorganization plan is confirmed. 11 U.S.C. § 365(d)(2). In the meantime, the executory contract remains in effect and creditors are bound to honor it."); *see also, In re Gunter Hotel Assoc., Ltd.,* 96 B.R. 696, 700 (Bankr.W.D.Tex.1988).

 UOP cannot defend against the Trustee's claim for breach on these grounds. If an executory contract is breached prior to the estate's decision to assume or reject, the estate has a sufficient interest to confer standing to sue for that breach. *Gunter Hotel, supra.* Such a formulation is also consistent with section 365(d), which allows non-debtors the right to petition the court to compel an early election. Until the court has

affirmatively authorized rejection, the non-debtor party is not free to ignore the terms of the contract, and must continue to perform. *Id.* and cases cited therein. It follows that, if the nondebtor party refuses that performance, the estate has a remedy—and standing to pursue that remedy.

### Ability, as a matter of law, to establish a claim for breach:

■ The parties agree that the Licenses are governed by Illinois law. In Illinois, the essential elements for breach of contract are:

1) the existence of a valid and enforceable contract;

2) performance by the plaintiff;

3) breach of the contract by the defendant; and

4) resultant injury to the plaintiff.

*Nielsen v. United Services Automobile Ass'n,* 244 Ill.App.3d 658, 183 Ill.Dec. 874, 877, 612 N.E.2d 526, 529 (2 Dist.1993) (citations omitted).

UOP asserts that "the Trustee cannot establish the first element, the existence of a contract of the estate because the El Paso Licenses have never been assumed by the estate." As stated *supra,* there is no merit in that argument.

■ UOP also argues that the Trustee cannot establish a cause of action for breach because the Trustee has not himself performed under the contract. There is no question that there was such a failure of performance. However, the Trustee maintains that assuming the Licenses and curing the payment defaults would have constituted performance. Therefore, the Trustee argues, because UOP effectively prevented the estate from assuming the Licenses (by selling "new" licenses to RHC), UOP prevented the estate from performing and cannot now use that failure to perform as a defense to a breach claim. The Trustee's position is correct. *See, Wasserman v. Autohaus on Edens, Inc.,* 202 Ill.App.3d 229, 147 Ill.Dec. 571, 578, 559 N.E.2d 911, 918 (3 Dist.1990) ("A person who prevents the performance of

an alleged condition to a contract cannot take advantage of his conduct to claim that the resulting failure of the condition relieves him of his obligation under the contract.") (citations omitted).

■ Additionally, the Code places an independent duty on the non-debtor to continue the performance of an executory contract until it is assumed or rejected. Until an executory contract has been assumed or rejected the Code relieves the debtor of his duty to perform. *Gunter Hotel, supra.* Whether the debtor performs or not, the non-debtor must perform until assumption or rejection. Thus UOP cannot rely on L.P.'s failure to perform as a defense to the estate's breach of contract claim because the estate was under no duty to perform by operation of federal law. *See, New Hampshire Elec. Co-op.,* 884 F.2d at 14.

■ Finally UOP asserts that the "Trustee can produce no evidence that UOP breached its obligations under the El Paso Licenses." *UOP's Brief* at 32. The Trustee counters by alleging, without citation, that the "Trustee has established that UOP breached Article 11 of the Licenses, regarding assignment and transfer. The evidence also demonstrates that UOP violated the termination provisions of the Licenses by failing to give the estate six months' written notice prior to the *de facto* termination effected by UOP's transaction with RHC and Chevron." Trustee Post–Trial Brief at 25. The court finds these allegations by the Trustee to be without merit.

Article 11 of the Licenses restricts either party from assigning or transferring the Licenses without the prior written consent of the other party.[11] Essentially, the Trustee's argument is that UOP wrongfully withheld its consent of any transfer of the Licenses by L.P. The Restatement explains that:

(1) An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the

---

11. Unless the assignment or transfer is made to the successor in interest of all or substantially all of the assigning party's business and assets.

assignee acquires a right to such performance.

(2) A contractual right can be assigned unless

(c) Assignment is validly precluded by contract.

RESTATEMENT (SECOND) OF CONTRACTS § 317 (1979).

The question is whether assignment of the Licenses was validly precluded by contract, such that UOP was entitled to withhold their consent to an assignment by L.P. Article 11 of the Licenses, on its face, does not place any duty on UOP to consent to a transfer of the Licenses. Nevertheless, Illinois, like most states, imposes a duty of good faith and fair dealing on contracting parties. *See, Management Services of Illinois, Inc. v. Health Mgmt. Systems, Inc.*, 907 F.Supp. 289, 295 (C.D.Ill.1995) (contracting party must exercise discretion granted under a contract reasonably and in a manner consistent with the parties' expectations).

A contractual provision against assignment is generally for the benefit of the obligor. *See* RESTATEMENT (SECOND) OF CONTRACTS § 322 (1979). The obligor, who has already completed its performance, has a right to rely on return performance being made by the party with whom it contracted. In the instant matter there could be no expectation that UOP would consent to an assignment. The purpose of Article 11 was to prevent the assignment of duties still owed under the Licenses and it cannot be seriously argued that the parties expected that consent would be granted. This is especially true when, as in this case, the party wishing to assign is already in default of its obligations under the Licenses. UOP did not breach its contract with L.P. by withholding its consent. UOP was under no duty, either contractual or statutorial, to consent to the assignment of the Licenses by L.P.

Likewise, the court finds that UOP did not breach Article 10 of the contract regarding termination of the Licenses. Article 10 requires that six months' notice be given before the Licenses can be terminated. The Trustee cites no support for its theory that UOP's sale to RHC rendered the L.P.

Licenses valueless and therefore constituted a "de facto termination." Trustee's Post–Trial Brief at 25. The court's research has also failed to discover any authority for such a finding. UOP did not terminate the Licenses by selling "new" licenses to RHC and thus was not required to provide six months' notice to L.P. or the Trustee.

**THE TRUSTEE'S FOURTH COUNT:**

Trustee's Fourth Count requests equitable subordination of the UOP claim because UOP allegedly breached its fiduciary duty to the Unsecured Creditor's Committee. The Fifth Circuit laid out the standard for equitably subordinating bankruptcy claims in *Matter of United States Abatement Corp.*, 39 F.3d 556, 561 (5th Cir.1994).

Equitable subordination is a remedial, not penal, measure which is used only sparingly. This court has established a three-prong test to identify those situations in which equitable subordination is permitted: (1) the claimant must have engaged in some type of inequitable conduct; (2) the conduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) the invocation of equitable subordination must not be inconsistent with the provisions of the Bankruptcy Code.

While our three-pronged test appears to be quite broad, we have largely confined equitable subordination to three general paradigms: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors.

*Id.* (Citations omitted).

UOP argues that its claim cannot be equitably subordinated because it does not fit into any of *U.S. Abatement's* three paradigms. The Trustee counters with the proposition that UOP's actions and claims should be scrutinized more closely because UOP stood in a fiduciary capacity to the other unsecured creditors by virtue of its position on the creditors' committee.

This is a matter of first impression for bankruptcy courts. Although courts are uniform in their opinion that the members of a creditors committee owe a fiduciary duty to the class that the committee represents, the extent of that duty is not well defined. *See, e.g., Laclede Cab Co.,* 145 B.R. 308 (Bankr. E.D.Mo.1992); *Drexel Burnham Lambert Group, Inc.,* 138 B.R. 717 (Bankr.S.D.N.Y. 1992); *Tucker Freight Lines, Inc.,* 62 B.R. 213 (Bankr.W.D.Mich.1986). The Trustee recommends that the court apply the three part test for usurpation of a corporate asset by a corporate fiduciary to members of a creditors' committee. The elements of that test are that: "The fiduciary must (1) disclose the proposed transaction; (2) obtain the consent of the represented parties; and (3) demonstrate that the proposed act is not detrimental to the corporation." Trustee's Post–Trial Brief at 27. If the court were to apply the test the Trustee proposes it is clear that UOP would lose. UOP arguably did not disclose all of the ramifications of the RHC deal to the committee members, did not obtain the other members consent, and did not demonstrate that the RHC deal was not detrimental to the other unsecured creditors.

■ The court's difficulty in applying a test designed to prevent insiders of a corporation from taking unfair advantage of their position arises from the legitimate conflicts inherent in committee membership. A corporate insider's principal and overriding responsibility is to the shareholders of the corporation, and such insider is not permitted to allow personal interests to conflict with that overriding duty. The insider is expected to subordinate his own interests to that paramount responsibility. The same expectation is not appropriately placed on the members of creditors' committees in a bankruptcy case. True enough, a committee member has a responsibility to deal fairly with the other creditor members of the represented class. But each committee member also has a legitimate right to look out for its own interests, both in its capacity as a creditor with a claim against the estate, and in its larger role in the business community, where its primary concern and responsibility is to its own bottom line. As one court put it, "[i]t is axiomatic that each unsecured creditor has a conflict with every other unsecured creditor in the sense that, absent a 100% distribution, the elimination or reduction of any such claim will benefit all others." *In re Microboard Processing, Inc.,* 95 B.R. 283, 285 (Bankr.D.Conn.1989).

If every business action undertaken by a member of a creditors committee could be scrutinized under the corporate usurpation test, no creditor would ever be willing to serve on a creditors' committee. Committee members must have some latitude to conduct their own business affairs, make business decisions, pursue business opportunities and the like, without fearing that they must disclose and justify every business choice that they make which could conceivably have an effect on other members of the committee.

■ The rationale behind the corporate usurpation doctrine is to prevent corporate insiders from taking advantage of their positions and/or dealing on inside information. Committee membership affords similar opportunities, and a rule to curb such abuse does make sense, so long as the rule articulated does not also chill active participation on committees in bankruptcy. The essence of the corporate usurpation doctrine serves perhaps as a useful guideline to prevent such abuse. Whatever the parameters of such a rule ought to be however, the facts of this case fall comfortably outside the zone of liability.

■ UOP did not learn of the RHC deal because of its membership on the Unsecured Creditors Committee. UOP had the opportunity to negotiate a financially remunerative arrangement with RHC because of UOP's position as licensor of the technology necessary to operate a refinery. Its decision to pursue the opportunity with RHC was based on its good faith belief that 1) it was a lost volume seller; 2) that the L.P. Licenses were non-transferable; and 3) that it was entitled to sell new licenses to RHC without crediting any of the purchase price against its proof of claim. As it turns out, UOP was in error on

at least two of its assumptions.[12] But UOP did not take unfair advantage of its membership on the committee to an extent that would warrant the extraordinary remedy of equitable subordination. UOP was presented with a business opportunity that arose from its own ongoing business activities in administering and protecting its technology. It discovered independently that the refinery was being operated without the Term Lenders' having made any pre-arrangements for the continued use of the technology, and made its own decision that RHC could not be operating without first getting a license from UOP. RHC took the position that they did not need permission to operate because they had foreclosed on the licenses. RHC was an entity not related to the bankruptcy, and UOP did not learn of RHC's operations from UOP's participation on the committee. Of course, RHC eventually argued that, if the licenses had not been acquired in the Term Lenders' foreclosure, then they must still be in the estate, where they could be assumed then assigned by the estate. And UOP just as predictably disagreed with that position.

It was at this particular point that the question of breach of duty might become most pertinent. Yet it is also here that we arrive at the intersection of a creditor's duty *vis-a-vis* its membership on a committee, and a creditor's right *vis-a-vis* its status as an ongoing money-making enterprise. UOP pursued first its own self-interest with respect to this business opportunity, rather than advising the committee of the recent turn of events. UOP thus experienced the "conflict" that accompanies a creditor's both continuing to do business and serving on a creditor's committee. This it was (and must be) permitted to do, else the liability associated with committee membership would effectively chill participation on such committees. Liability ought not attach whenever there is a conflict. Nor should courts decree that, whenever there is such a conflict, the duty to the committee ought always to prevail. Such a rule is simply too harsh and unrealistic, and would only lead to a mass exodus from committee participation.

This particular business opportunity did not come to UOP as a result of UOP's participation on the committee, nor did it present itself as a result of some insider information derived by UOP from its being a committee member. That being the case, even though there was a "conflict" between UOP in its capacity as a member of the committee and UOP in its capacity as an ongoing business, these circumstances do not present a case in which the committee duty ought to have prevailed.

UOP did indeed attempt to garner a windfall to which this court has concluded it was not entitled (*i.e.* double payment). However, UOP made the attempt with a good faith belief that it was a lost volume seller and without the willful disregard for the rights of the represented class that might justify the application of equitable subordination.[13] It acted out of its own legitimate business interests, interests that may well have technically conflicted with its duties as a member of the creditors' committee, but which ought not trigger the sort of liability that would result in its claim being equitably subordinated.

## CONCLUSION

The court concludes that, as to Trustee's Count One, UOP's claim shall be reduced by $1,970,037.38. Such amount reflects the amount of royalty due and owing which was satisfied through the RHC transaction. As to the Trustee's Count Three, the court finds that the Trustee lacks standing to bring the claim. In the alternative, the court finds that UOP did not breach its contract with L.P. As to the Trustee's Count Four, the court finds insufficient grounds to justify the equitable subordination of UOP's claim. Judgment shall be entered consistent with this decision.

---

12. Whether the L.P. Licenses could have been transferred to RHC was not before this court.

13. Compare, *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717 (willful misconduct strikes the appropriate balance between breach of duty and the limited immunity of a committee member).