In re HASKELL–DAWES, INC., Debtor.

Bankruptcy No. 95–15723DWS.

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 27, 1995.

Andrew N. Schwartz, Shaiman, Rovin & Schwartz, Philadelphia, PA, for Debtor.

Michael J. Cordone, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Reed–Chatwood, Inc.

Joshua Z. Goldblum, Feasterville, PA, for Dean A. Stenberg.

Eric L. Frank, Miller and Miller, Philadelphia, PA, for Precision Wood Products, Inc.

Ina Weiner, Philadelphia, PA, for Internal Revenue Service.

Joseph Minni, United States Trustee, Philadelphia, PA.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the motion of Haskell–Dawes, Inc. ("Debtor"), requesting that a committee of creditors not be appointed pursuant to 11 U.S.C. § 1102(a)(3) (the "Motion"). Objections to the Motion were filed by three unsecured creditors and a hearing on the Motion was held. Based upon Debtor's failure to establish "cause" for relief as required under § 1102(a)(3), the Motion is denied.

*BACKGROUND*

Debtor is in the business of manufacturing textile twisting machines.[1] (Record at 38). Debtor's sole officer is Alan Woodruff ("Woodruff"). (Record at 12). He and his wife, Eleanor Hunt Woodruff, own all of the stock in Debtor. (Record at 12).

On July 26, 1995, Debtor filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code. At such time, Debtor elected to be considered a "small business" under 11 U.S.C. § 1121(e). (Record at 13). The parties agree that Debtor satisfies the qualifications for this status. (Record at 11).

On September 8, 1995, Debtor filed the Motion. In the Motion, Debtor asserts that the additional costs that it would incur in the event a creditors' committee was appointed would unduly burden and delay its reorganization efforts and would "undermine the basic purpose for which the Debtor elected to be considered a small business." (Motion at ¶¶ 7–9). Three unsecured creditors filed answers to the Motion objecting to the relief requested therein. These creditors are Dean Stenberg ("Stenberg"), Reed–Chatwood, Inc. ("Reed–Chatwood") and Precision Wood Products, Inc. ("Precision Wood") (collectively referred to hereinafter as the "Respondents").

A hearing (the "Hearing") on the Motion was held on October 3, 1995. Two witnesses testified at the Hearing: Woodruff and Harry Landsburg ("Landsburg"). Landsburg is an employee of Delaware Valley Industrial Resource Center which is one of Debtor's unsecured creditors. (Record at 61–62). The evidence in the record relevant to our disposition of this matter is not in dispute.[2]

---

1. This machinery is used to make rope. It is also used to make the twisted paper handles that are commonly seen on shopping bags. (Record at 38).

2. At the Hearing, counsel for Stenberg and the United States Trustee elicited testimony from Woodruff regarding a loan application which he signed on Debtor's behalf for Meridian Bank. (Record 20–21, 44–45). In addition, counsel for Meridian Bank sought to introduce the loan application, which was marked as Exhibit S–1, into evidence. Meridian Bank vigorously objected to the admission of this document on the grounds that: (i) it contains confidential information; (ii)

regulatory authority prohibits the dissemination of such documents; and (iii) since the document was not requested from nor produced by either Debtor or Meridian Bank, it could not have been obtained except by some inappropriate means. (Record at 45–46, 65–66). We deferred ruling at the Hearing upon the admissibility of this loan application to allow Meridian Bank the opportunity to identify the regulatory authority which it claimed protects the confidentiality of the application. (Record at 66–67); we did not receive any submission from Meridian Bank. However, given our conclusion that Debtor failed to establish "cause" for relief under § 1102(a)(3), neither

Debtor has approximately 65 creditors holding unsecured nonpriority claims totaling approximately $501,000. (Record at 13–14). The claims of Stenberg, Reed–Chatwood and another creditor, Fantasia Miguel, S.A. ("Fantasia"), account for approximately $433,000 of this total. (Record at 14, 43). Whereas the claims of Stenberg and Reed–Chatwood are for monies owed for assets which the Debtor purchased (Record at 52), Fantasia's claim is for a deposit which it made on a piece of machinery ordered from the Debtor. (Record at 43). The Debtor intends to perform the contract with Fantasia applying the deposit to the purchase price and billing for the balance. The claim will be thus satisfied. (Record at 43).

The remaining unsecured creditors, whose nonpriority claims total approximately $67,000 in the aggregate, hold individual claims in amounts of $6,000 or less. (Record at 14). These smaller claims represent trade debt. (Record at 52).

Debtor disputes the claims of three of its unsecured nonpriority creditors: Stenberg, Reed–Chatwood and Precision Wood. (Record at 13–14). Notably, these three creditors are the same ones which oppose Debtor's request not to have a committee of creditors appointed. Debtor does not dispute any of the trade claims.

Although Debtor has not yet formulated a plan of reorganization, it intends to file a plan which would provide a "pot of money" to be divided among the unsecured creditors. (Record at 15). According to Debtor, the size of the pot will be inversely affected by the cost of its administrative expenses. To the extent the amount of its administrative expenses increase, the size of the "pot" will decrease. (Record at 15). As of the date of the Hearing, Debtor had not formed an estimate of the administrative costs, excluding potential costs relating to an unsecured creditors' committee, which it anticipates will be incurred in this bankruptcy case. (Record at 43).

Debtor expects opposition to its plan of reorganization from its two largest creditors:

Stenberg and Reed–Chatwood. (Record at 15). Consequently, Debtor anticipates relying upon the cram-down procedure available under 11 U.S.C. § 1129(b) to get its plan confirmed. (Record at 16).

Woodruff intends to retain his interest in the Debtor through a contribution of new value. (Record at 28). He admits that the amount of his contribution may affect how much money is available for distribution to the unsecured creditors. (*Id.*).

Debtor's income in 1993 was $624,000; its income in 1994 was $707,849. (Record at 18). Debtor's income for 1995 is expected to be in the same "ballpark." (*Id.*) Since filing for bankruptcy, Debtor has taken orders for machinery and sold replacement parts. (Record at 42). Debtor has operated on a positive cash flow, albeit marginally so. (Record at 42). On the date of the Hearing, Debtor expected to receive approximately $40,000 in payment for a piece of machinery which it had sold. (Record at 48).

Debtor's Motion is supported by the Delaware Valley Industrial Resource Center ("DVIRC") which holds an unsecured nonpriority claim in the amount of $960. (Record at 62). This organization is a private non-profit economic development corporation which provides manufacturing extension services to small and medium size businesses in five counties, including Philadelphia. (*Id.*) The organization supports Debtor's Motion for two reasons: (i) the appointment of a creditors' committee would diminish the funds available for distribution to unsecured creditors; and (ii) anything that detracts from the Debtor's ability to focus on operating its business is not desirable. The representative of DVIRC noted, however, that the opposition was generic, not specific to this case as to which he had no knowledge. (Record at 63–64).

*DISCUSSION*

As a general rule, a trustee in a Chapter 11 case is required to appoint a committee of creditors holding unsecured claims. *See* 11 U.S.C. § 1102(a)(1) ("the

---

Woodruff's testimony relating to the loan application nor the application itself is integral to our decision. Therefore, a determination regarding the admissibility of the loan application is not necessary.

United States trustee shall appoint a committee of creditors holding unsecured claims"). *See also In re Texaco Capital, Inc.*, 79 B.R. 560, 566 (Bankr.S.D.N.Y.1987) (appointment of committee of creditors holding unsecured claims against Chapter 11 debtor is mandated "under § 1102(a)(1) if there are creditors willing to serve"); 5 Collier on Bankruptcy ¶ 1102.01 at 1102–4 ("As long as there are creditors who hold unsecured claims and who are willing to serve on a committee of unsecured claimants, the United States trustee is required to appoint a committee to represent such claimants[.]"). The creditors' committee is responsible for representing the interests of its constituents and maximizing their recovery. *See, e.g., Official Unsecured Creditors' Committee v. Michaels (in re Marin Motor Oil, Inc.)*, 689 F.2d 445 (3d Cir.1982) (*quoting* H.R.Rep. No. 95–595, 95th Congr., 2d Sess. 401, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6357 (creditors' committee to represent class of creditors from which it is selected)), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983); *Retail Marketing Company v. Northwest National Bank (In re Mako, Inc.)*, 120 B.R. 203, 212 (Bankr.E.D.Okla.1990) (creditors' committee is intended to be integrally involved in formulation of Chapter 11 Plan to optimize the return to the class). *See also* Virginia Bell & Paul Jones, *Creditors' Committees and their Roles in Chapter 11 Reorganizations*, 1993 Det.C.L.Rev. 1551, 1571 (main function of creditors' committee is to maximize recovery for creditors it represents). To this end, the Bankruptcy Code authorizes such committees to, *inter alia:* consult with the trustee concerning the administration of the case; investigate the acts, conduct and financial condition of the debtor; investigate the operation of the debtor's business and the desirability of having such business continue; participate in the formulation of a plan; and provide advice to those whom the committee represents regarding any plan that is formulated. *See* 11 U.S.C. § 1103(b). The Bankruptcy Code also authorizes a creditors' committee to employ counsel to represent it. *See* 11 U.S.C. § 1103(a). Compensation awarded to the committee's counsel under § 330(a) is considered an administrative expense of the estate. *See* 11 U.S.C. §§ 330(a), 503(b)(2).

■■■ As part of the Bankruptcy Reform Act of 1994, an exception to the general rule requiring the appointment of a creditors' committee was enacted for small businesses. *See* 11 U.S.C. § 1102(a). Under this exception, the Court may, "[o]n request of any party in interest in a case in which the debtor is a small business and for cause," order that a committee of creditors not be appointed. 11 U.S.C. § 1102(a)(3). This exception is one of several amendments that was made to the Bankruptcy Code in 1994 in an effort to "expedite the process by which small businesses may reorganize under chapter 11." Bankruptcy Reform Act of 1994, House Report No. 103–835, Section 218, *reprinted in* 1994 U.S.Code Cong. & Ad.News 3340, 3358. The other amendments include the following:

(i) A definition was added to § 101 for small businesses. *See* 11 U.S.C. § 101(51C) (defining "small business").

(ii) A subsection was added to § 1121 for debtors which qualify as small businesses and elect to be considered as such. Under this paragraph, the exclusivity period applicable to such debtors was shortened to 100 days and a requirement was imposed that all plans must be filed within 160 days of the order for relief. *See* 11 U.S.C. § 1121(e).

(iii) A subsection was added to § 1125 for debtors which elect to be considered small businesses under § 1121(e). This new subsection provides such debtors with the ability to obtain conditional approval of a disclosure statement subject to final approval after notice and a hearing, to obtain acceptances and rejections of a plan based upon a conditionally approved disclosure statement, and to have the hearing on their disclosure statement combined with the hearing on plan confirmation. *See* 11 U.S.C. § 1125(f).

Notably, the procedures added in § 1121(e) and § 1125(f), which provide small businesses with the ability to accelerate the timetable that normally applies in Chapter 11, apply

only to debtors which elect to be considered small businesses. The same does not hold true for § 1102(a)(3). The relief available under § 1102(a)(3) applies in any case in which the debtor is a small business, as that term is defined in § 101(51C), *regardless* of whether the debtor elects to be considered as such under § 1121(e). In short, Debtor would be eligible for relief under § 101(a)(3), assuming it met the requirements imposed thereunder, by virtue of its status as a "small business" and not because it chose to proceed through Chapter 11 on the accelerated timetable available to small businesses. This fact undercuts Debtor's assertion that "the appointment of a committee of creditors would undermine the basic purpose for which the Debtor elected to be considered a small business." Motion at ¶ 8.

· ■ In enacting § 1102(a)(3), Congress could have altogether eliminated the requirement that a creditors' committee be appointed in cases involving small businesses. It did not. Instead, it conditioned the relief available under § 1102(a)(3) upon the following: (i) a request made by a party in interest; and (ii) a showing of "cause" for granting such relief. Respondents do not dispute that Debtor is a "party in interest"; consequently, our focus is on the latter requirement of "cause."

No explanation is provided in the Bankruptcy Code for what constitutes "cause" for relief under § 1102(a)(3) nor is the legislative history of assistance in this regard.[3] Accordingly, no standard exists for our application.

Debtor asserts four bases for establishing "cause." Upon examination, we conclude that none of these bases establishes "cause" under § 1102(a)(3).

■ Firstly, Debtor asserts that "cause" exists for dispensing with a creditors' committee because the additional costs of such a committee and the professionals which it might hire would unduly burden its reorganization efforts. Other than the general and conclusory statements to this effect made by its principal, Woodruff (Report at 16, 32–33), Debtor introduced no evidence into the record to support this argument. There was no financial data of any kind presented regarding Debtor's reorganization efforts and no attempt made to explain in any concrete terms how the additional costs incurred by a creditors' committee might negatively impact upon Debtor's ability to reorganize. Accordingly, we have no basis for concluding that the appointment of a creditors' committee will "unduly burden" the Debtor's reorganization.

■ Furthermore, the mere fact that a creditors' committee, if appointed, may translate into additional costs to the Debtor's estate[4] does not justify dispensing with the committee. Indeed, the truism that the appointment of a creditors' committee may result in additional costs to the debtor could be advanced by every small business seeking relief under § 1102(a)(3).[5] Had Congress' sole concern in devising § 1102(a)(3) been to relieve small business debtors from the responsibility of paying for costs resulting from the appointment of a creditors' committee, it could have easily tailored the provision to effect this result.[6] Since Congress did not choose this route, we conclude that the "cause" requirement imposed in § 1102(a)(3) must require something more than a general assertion that the appointment of a creditors' committee may cost the Debtor money.[7]

3. We note that no decisions have been rendered construing this requirement as yet.

4. At the Hearing, Debtor argued that "Congress ... enact[ed] new legislation in order to allow a small business not to be burden[ed] with all the costs and expenses which are usually contained in a large bankruptcy. The formation of a creditor's committee puts another layer of expenses and burden on the debtor." (Record at 68).

5. It stands to reason that small businesses which conclude it will be more cost-effective to address the concerns of its unsecured creditors through a committee representing their interests rather than on a one-to-one basis will not seek relief under § 1102(a)(3).

6. For instance, Congress could have drafted § 1102(a)(3) so that the decision of whether to dispense with the creditors' committee was made by the small business debtor.

7. On cross-examination, Woodruff testified that Debtor would prefer to deal with the Respondents individually rather than through a creditors' committee and that he believed this option would result in lower costs to the Debtor. (Rec-

■ Debtor also asserts that "cause" exists for granting relief under § 1102(a)(3) because it intends to file a pot plan, which would provide for a "pot of money" to be divided among the unsecured creditors and that any costs incurred by professionals hired by a creditors' committee will decrease the amount of money available in the pot. We find this argument equally unpersuasive. There are many contingencies that could affect the amount of money available to the unsecured creditors in the pot; the possibility that fees may be incurred by professionals retained by a creditors' committee is only one of them. Moreover, given the many roles which a creditors' committee may play in a bankruptcy case, *see* Neal Batson & Lee Brooks Rivera, *Role of Creditors' Committees,* C638 ALI–ABA 47 (1991) (discussing roles of formal creditors' committees in Chapter 11 cases), it is quite possible that the monetary benefits gained by the unsecured creditors, through the efforts of the committee, could far outweigh any impact which the committee's costs may have on the "pot."

By way of example, Woodruff testified on cross-examination that he intends to retain his interest in the Debtor by contributing money to the estate, but has not determined the specific amount of money which he will contribute. (Record at 28). He also admitted that the amount of money which he contributes will affect the amount available for distribution to the unsecured creditors. (Record at 28). Woodruff's retention of his equity in the Debtor without full payment of unsecured creditors is contrary to the absolute priority rule, and potentially fatal to the reorganization effort. 11 U.S.C. § 1129(b)(2)(B). One of the roles which a creditors' committee could serve in this case would be to negotiate a larger dividend from Woodruff's contribution, and in so doing increase the likelihood of a confirmable plan. The creditors' committee might be able to increase Woodruff's contribution of new value by an amount equal to or greater than the cost resulting from the appointment of the creditors' committee. If so, then there would

be no disadvantage posed to the unsecured creditors by the costs of the committee's professionals. Since no evidence was offered eliminating this possibility, we have no reason to conclude that it could not occur.

■ Thirdly, Debtor argues that "cause" exists for dispensing with the creditors' committee since it is unlikely that any consensual plan will be proposed and Debtor fully expects to seek confirmation of its plan through the cram-down provisions of § 1129(b). The only evidence which Debtor introduced to explain the basis of its belief that it will be unable to propose a consensual plan is the conclusory statement that its "two largest creditors dominate." (Record at 15). No evidence was offered regarding Debtor's efforts to negotiate with its two largest creditors and little evidence was presented regarding their claims. Furthermore, Debtor's argument ignores the benefits which a creditors' committee could provide even if Debtor seeks confirmation under § 1129(b). The creditors' committee could be instrumental in identifying any obstacles which exist to confirmation, in negotiating resolutions to such obstacles and, possibly, in ultimately effecting a consensual plan.

■ Lastly, Debtor asserts that "cause" is established for dispensing with the appointment of a creditors' committee since the only creditors to answer its Motion were the three unsecured creditors whose claims are: (i) for non-trade debt; and (ii) in dispute. Debtor contends that these creditors, the Respondents, seek to have a creditors' committee appointed solely to further their own interests and that they should be required to hire counsel, at their expense and not at the expense of the estate, for this purpose. In rejecting this argument, we note that all of Debtor's unsecured creditors, except Respondents, possess claims in amounts of less than $6,000. It is unlikely that such creditors, even if they are not in favor of Debtor's Motion, would have considered it economically practicable to expend additional monies to formally oppose the Motion. Furthermore,

---

ord at 31). Debtor never presented any evidence in support of this "belief." Had Debtor developed this point and established that Respondents

are the only unsecured creditors with an interest in forming a creditors' committee, a stronger showing for "cause" would have been made.

the fact that only Respondents filed answers to the Motion does not mean that they are the only unsecured creditors with an interest in having a creditors' committee appointed. Indeed, there is no evidence to this effect in the record.[8] Accordingly, we cannot assume that all unsecured creditors other than Respondents are uninterested in having a creditors' committee appointed to represent their interests.

 Furthermore, Debtor's concern that it should not be forced to pay for legal fees incurred solely to protect the Respondents' interests overlooks the protections which the Bankruptcy Code and the common law provide to prevent such an occurrence. The Bankruptcy Code specifically delegates responsibility for choosing the members of the creditors' committee to the United States trustee; the decision is not made by the creditors.[9] *See* 11 U.S.C. § 1102(a). In addition, the creditors appointed to the creditors' committee have a fiduciary obligation to act in the interests of the members whom they represent. *See Locks v. United States Trustee*, 157 B.R. 89, 93 (Bankr.W.D.Pa. 1993); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 655, 661–62 (Bankr. E.D.Pa.1987). This duty prohibits members of the creditors' committee from using their position to advance their own individual interests. *See In re Map International, Inc.*,

105 B.R. 5, 6 (Bankr.E.D.Pa.1989) (members of creditors' committee "may not use their positions as committee members to advance only their individual interests"); *In re Enduro Stainless, Inc.*, 59 B.R. 603 (Bankr. N.D.Ohio 1986) (member of creditors' committee "may not act through the committee in such a manner as to promote only that creditor's interests"). If a creditor on the committee violates this duty, relief may be sought from the Court to have the creditor removed from the committee. *See In re Map International, Inc.*, *supra*; *In re Enduro Stainless, Inc.*, *supra*. Lastly, counsel employed by the creditors' committee is permitted to recover fees and costs from the estate under § 330(a) for services that benefitted the creditors' committee as a whole, but not for services that benefitted only certain creditors. *Fulbright & Jaworski v. Sunbeam–Oster Company, Inc. (In re Allegheny International, Inc.)*, 139 B.R. 336, 345–346 (W.D.Pa.1992) (in order to be compensable from estate funds, services rendered by attorney for committee must be in interest of those represented as a group and not for benefit of individual creditors). Since the aforementioned safeguards are available to Debtor to ensure that Respondents do not use the creditors' committee solely to further their own interests, we conclude that it would be improper to grant relief under § 1102(a)(3) for this purpose.

8. At the hearing, the United States Trustee advised the Court that interest exists in forming a creditors' committee, but did not disclose the number or identity of the unsecured creditors with this interest:

> UNITED STATES TRUSTEE: We did make several attempts, your Honor, to form a committee in this case. And in light of Mr. Schwartz's motion, I agreed and the creditors in attendance at the creditors meetings, your Honor, agreed that we would let the Court resolve this issue and then I will decide. Once the Court gives the green light or the red light I will be able to act. There are some issues as to who will serve on the committees.
> THE COURT: ... My view was that if there were no interest at the creditor's meeting then we wouldn't be here today. As it turns out apparently there is interest sufficient to form a committee, so that the next step is to decide whether—how to apply the new statute.
> UNITED STATES TRUSTEE: I just like to put final, your Honor, this note for the record. That at the time of the first creditors' meeting

in this case, we have, what was it, September 7th, there was interest at that time to form a creditor's committee.
Record at 7–8. In addition, no evidence was offered by any other party regarding the number or identity of the unsecured creditors in favor of having a creditors' committee. Therefore, there is no evidence in the record to support a finding that Respondents are the only unsecured creditors interested in having a creditors' committee formed.

9. At the Hearing, the United States Trustee specifically acknowledged that it is his responsibility to choose and appoint the members of the creditors' committee, stating that if the Motion is denied, he will "scrutinize the applications, the questionnaires ... and decide who will be the members or will not be the members of the committee." (Record at 74). Since the United States Trustee is responsible for deciding who to appoint to the creditors' committee, Respondents are not guaranteed membership on the committee even though they are the only unsecured creditors opposing the Motion.

Debtor has failed to establish "cause" for relief under § 1102(a)(3). Accordingly, we deny its Motion. An Order consistent with this Memorandum Opinion will be entered.