In re LIFE SERVICE SYSTEMS, INC., Debtor.

James R. Walsh, Trustee of the Bankruptcy Estate of Life Service Systems, Inc., Plaintiff,

v.

Westmoreland Human Opportunities, Inc., Defendant.

Bankruptcy No. 97–20226–BM.
Adversary No. 98–2082–BM.

United States Bankruptcy Court,
W.D. Pennsylvania.

June 20, 2002.

**506**

James R. Walsh, Spence, Custer, Saylor, Wolfe & Rose, Johnstown, PA, for trustee/plaintiff.

Daniel B. Pagliari, Paletta & Pagliari, P.C., Lower Burrell, PA, for defendant.

Joseph S. Sisca, Assistant United States Trustee, Western District of Pennsylvania, Pittsburgh, PA.

### MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

This matter is on remand for determination of two issues. We first must determine whether defendant Westmoreland Human Opportunities (hereinafter "WHO"), which at one time was a member of the Official Committee Of Unsecured Creditors, owed a fiduciary duty to fellow general unsecured creditors with respect to a transaction involving an asset that does not qualify as property of the debtor's bankruptcy estate. If it does owe a fiduciary duty, we also must determine whether WHO breached that duty when it engaged in the transaction, wherein its actions benefitted itself and inured to the detriment of the other unsecured creditors.

We conclude for reasons set forth below that a fiduciary duty can arise in such a situation and that, under the facts of this case, WHO in fact breached its fiduciary duty. We accordingly will enter a judgment in the amount of $135,653 in favor of the chapter 11 trustee and against WHO.

### —FACTS—

Debtor Life Service Systems, Inc. and defendant WHO are non-profit corporations which operate various community and social services programs for residents of Westmoreland County, Pennsylvania.

Debtor endeavored in 1995 to provide transitional housing for homeless families residing in Westmoreland County while they sought permanent housing and learned necessary skills for living.

In April of 1995, debtor submitted a request to United States Department of Housing and Urban Development ("HUD") for a grant under the federal Supportive Housing Program. Recipients of such grants are selected through a time-consuming nationwide competitive process. See 42 U.S.C. § 11386(b). As part of the process, debtor was required to submit an application and project proposal providing detailed information concerning the proposed housing project, debtor's past experience in providing housing assistance, and a budget for the project. While there is an obvious cost to this submittal, no party has offered the details of same.

In its application, debtor requested funding in the amount of $1,326,925 to cover the cost of acquiring, rehabilitating, and operating two apartment buildings. The cost of providing supportive services offered at these sites and a five percent fee to cover debtor's administrative overhead were also included.

HUD advised debtor in August of 1995 that it had preliminarily approved debtor's request for funding in the exact amount requested. Final approval was contingent upon completion of an acceptable technical submission. Debtor did as required and in the process expended additional blocks of time and resources putting together a final submission that was acceptable to HUD.

On February 6, 1996, HUD gave final approval for a transitional housing project to be located at 49 Division Street in Greensburg, Pennsylvania. Several days later, debtor and HUD executed a formal grant agreement which obligated HUD to provide $1,326,925 for the Division Street

property and which obligated debtor to administer the project at that site. The grant was for a term of three years and was subject to renewal.

Debtor purchased the Division Street property shortly after executing the agreement and began renovating it. The purchase price was $295,000.

As a precondition to receiving funds under the grant, debtor was required to obtain matching funds from others sources totaling $295,000. In addition to pledging $20,000 of its own money, debtor obtained pledges from Westmoreland Housing Authority ($25,000), United Way ($100,000) and Richard K. Mellon Foundation ($150,000). Debtor used these matching funds to complete renovations.

Only a few months after entering into the above agreement with HUD, debtor began experiencing what has been termed "financial and administrative problems". Little or no detail was offered as to the nature of these "problems". In an effort to overcome these "problems", debtor entered into an agreement with WHO in September of 1996 whereby WHO was to provide management assistance to debtor. While serving in this capacity, WHO learned the intimate details of debtor's operations, including the specifics of the above grant agreement with HUD.

The relationship between debtor and WHO was short-lived. WHO abruptly terminated it in October of 1996, for reasons that are not clear.

After WHO pulled out, debtor retained Adelphoi, Inc., another non-profit organization operating in Westmoreland County, to manage debtor and to conduct its day-to-day operations. Pursuant to the terms of the agreement, all of debtor's board members resigned and were replaced by directors selected by Adelphoi.

On January 14, 1997, approximately two months after Adelphoi had taken over managing debtor's affairs, debtor filed a voluntary chapter 11 petition. The decision to do so was made by the newly-appointed board of directors Adelphoi had selected.

WHO was listed on the accompanying schedules as having a general unsecured claim for management services it had provided in September and October of 1996. Also listed as creditors were matching fund grantors Westmoreland County Housing Authority ($3,798), United Way ($57,631), and Richard K. Mellon Foundation ($22,825). It is the custom of debtors filing under chapter 11 of the Bankruptcy Code in this district to schedule assets that it considers are not assets of the bankruptcy estate for the purpose of completeness and for informational purposes. The theory behind this practice stems from the fact that the bankruptcy petition is executed under penalty of perjury and Rule 9011 and the Bankruptcy Bar is sensitive to the charge of impropriety. Debtor's interest in the supportive housing program grant was not listed on its schedules.

By the time of the bankruptcy filing, debtor had drawn down approximately $288,000 in grant funds.

An official committee of unsecured creditors was constituted shortly after the bankruptcy filing. A representative of WHO served on the committee until September of 1997, when it withdrew amid accusations of a conflict of interest. WHO apparently was sharing confidential information with third parties having an interest adverse to debtor's other unsecured creditors.

At the time of or shortly after debtor filed its bankruptcy petition, WHO and Adelphoi devised a scheme whereby they would divide the spoils of the supportive housing grant. Adelphoi would purchase

the property located at 49 Division Street at a future sale to take place in this court. WHO would replace debtor as the supportive housing grantee and would house program participants at 49 Division Street.

The parties acted as if they could merely direct the actions of HUD and HUD would strictly follow those directions. As future events showed, in this instance they were correct.

Two weeks after debtor filed its bankruptcy petition, HUD declared debtor to be in default of the provisions of the supportive housing grant. HUD informed debtor by letter dated January 28, 1997, that it was in default as a result of the bankruptcy filing. HUD asserted that debtor would receive no further grant disbursements and stated that the grant would be reactivated if debtor submitted a "workable plan". HUD further stated that it would cancel the remainder of the grant or might select someone else to administer it if a suitable plan was not proposed within thirty days.

Firmly under the control of the directors hand-picked by Adelphoi, debtor made no attempt during this thirty-day window of opportunity to submit a "workable plan" to HUD or to notify the members of the creditors' committee of HUD's letter.

Even though debtor did not respond within the thirty-day period, HUD did not terminate the grant or replace debtor at that time as the grantee. It instead sent another letter to debtor on March 4, 1997, inviting debtor to submit a "work-out plan for the continued implementation of the project".

As was the case with HUD's previous letter, debtor did not respond. Adelphoi's executive director instead sent a letter to HUD on March 17, 1997, directing that the supportive housing grant be reactivated.

The letter stated that "our intentions are to transfer the property [located at 49 Division Street] to Adelphoi, Inc. The program will be run by Westmoreland Human Opportunities".

Without having to undergo the rigors of the complex application process through which debtor had gone to get the supportive housing grant, WHO was immediately "chosen" by HUD to replace debtor as the grantee. On May 27, 1997, HUD and WHO executed an "amendment" to the grant agreement which identified WHO as "successor to Life Systems Services, Inc." The property located at 49 Division Street was identified as a venue for the program.

WHO paid no consideration to the bankruptcy estate for the right to succeed debtor as the grantee. Moreover, neither debtor nor WHO notified the committee of unsecured creditors or the court of this "amendment".

Debtor brought a motion in August of 1997 to sell the property located at 49 Division Street to a non-profit entity known as Westmoreland CHODO. The fact that CHODO was an affiliate of and controlled by Adelphoi was not disclosed in the motion.

The committee, which had no knowledge of the above "amendment", objected to the sale. It argued that the sale should be linked with a court-approved assignment of the supportive housing grant to a third party to ensure that debtor's expenditure of funds on 49 Division Street did not give rise to a claim by HUD to recapture funds debtor had already expended on the property. The supportive housing grant required debtor to use the property for supportive housing for a period of twenty years. In the event it was not so used, any amounts debtor had expended on the property were to be returned to HUD.

The understanding between WHO and Adelphoi whereby Adelphoi would purchase 49 Division Street while WHO would take over the supportive housing grant and house eligible participants there came to nought when a third party outbid CHODO at the sale and purchased the property. WHO suddenly was not interested in dealing with this third party and instead housed eligible participants at another location.

A motion to appoint a chapter 11 trustee was filed on October 27, 1997. Largely based upon recently divulged facts, the motion was granted on November 7, 1997.

Debtor's liquidating chapter 11 plan of reorganization subsequently was confirmed. The plan provided for payment in full to general unsecured creditors "to the extent funds are available". This qualifying phrase implied that general unsecured creditors would not necessarily be paid in full after all. They have not been paid in full to date and most likely never will be.

The chapter 11 trustee brought this adversary action against WHO on February 6, 1998. The complaint alleged that the supportive housing grant was property of debtor's bankruptcy estate and that WHO had breached its fiduciary duty to other unsecured creditors by replacing debtor as the program's grantee without first obtaining court approval. WHO responded that it had not breached its fiduciary duty because debtor's interest in the supportive housing grant was never property of the bankruptcy estate for purposes of the Bankruptcy Code.

The chapter 11 trustee also brought separate adversary actions against Adelphoi and debtor's directors whom Adelphoi had selected. Among other things, the chapter 11 trustee claimed that they had breached their fiduciary duty in connection with WHO's succession to the supportive housing grant. Both of these actions settled before going to trial.

Judgment in the amount of $135,653 was entered in this case in favor of the chapter 11 trustee after a trial. We found that debtor's interest in the supportive housing grant was property of the bankruptcy estate and that WHO had breached its fiduciary duty to fellow general unsecured creditors when it assumed debtor's rights under the supportive housing program grant.

WHO appealed the judgment to the district court, where it argued that we had erred in finding that debtor's interest in the grant was property of its bankruptcy estate. The District Court agreed with the finding and affirmed the judgment, whereupon WHO filed a timely appeal with the United States Court for the Third Circuit.

The Third Circuit reversed and remanded after determining that debtor's interest in the grant was not property of its bankruptcy estate. *Westmoreland Human Opportunities v. Walsh*, 246 F.3d 233, 241–256 (3d Cir.2001). It concluded, however, that this determination did not fully "dispose of the merits" of this case. Remaining to be determined was the question whether WHO had breached its fiduciary duty to fellow general unsecured creditors when it assumed debtor's interest in the grant without so notifying the other members of the creditors' committee. 246 F.3d at 256–57.

Our analysis as well as that of the District Court, it concluded, was "incomplete" because neither court had considered whether a fiduciary obligation to fellow committee members "can arise in connection with a transaction that falls outside of the debtor's bankruptcy estate". 246 F.3d at 257. The Third Circuit declined to decide the question because neither this court nor the District Court had consid-

ered it in the first instance and because neither WHO nor the chapter 11 trustee had fairly raised the question on appeal. *Id.*

The Third Circuit instead remanded the matter to the District Court, which in turn remanded it to this court for further proceedings to resolve the following issues: (1) whether a fiduciary obligation to fellow unsecured creditors can arise out of a transaction involving an item of property that does not qualify as property of the estate for purposes of the Bankruptcy Code; and (2) if it can so arise, whether WHO breached such a fiduciary duty based on the specific facts of this case. 246 F.3d at 258.

A hearing was held in this court on April 18, 2002, at which it was decided that the parties would thereafter submit briefs to assist the court in deciding these issues.

—DISCUSSION—

## FIDUCIARY DUTY AND NON-ESTATE PROPERTY

The Bankruptcy Code authorizes the United States trustee to appoint a committee of creditors in a chapter 11 case. 11 U.S.C. § 1102(a)(1). Among other things, the committee may investigate the debtor, participate in the formulation of a plan, and "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c).

■ By implication, § 1103(c) imposes on members of a committee, as was WHO in this case until it resigned amid accusations of a conflict of interest, a fiduciary duty towards the committee's constituents. *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir.2000). The primary purpose of the committee is to represent the interests of all general unsecured creditors and to maximize distribution to them. *In re Nationwide Sports Distributors,* *Inc.,* 227 B.R. 455, 463 (Bankr.E.D.Pa. 1998).

■ A committee member may not use its position on the committee to advance its own individual interests. *In re Haskell–Dawes, Inc.*, 188 B.R. 515, 522 (Bankr. E.D.Pa.1995). It violates this fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members. *Westmoreland Human Opportunities,* 246 F.3d at 256.

■ Although a committee member is a fiduciary with respect to those whom it represents, it is not a fiduciary with respect to the debtor or to the bankruptcy estate in general. *In re SPM Manufacturing Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993). Rather than being a mere conduit through which the debtor communicates and negotiates with creditors, a committee represents only its constituents. Its relationship with the debtor of necessity is adversarial. It is a partisan and therefore is obligated to assist and monitor the debtor in furtherance of the interests of its constituents rather than an impartial arbiter between debtor and its creditors. *Id.*

■ Neither our own research nor that of the parties has uncovered any case law that is directly on point with respect to the first issue before us on remand. The question whether a fiduciary duty to fellow unsecured creditors can arise with respect to a transaction by a committee member involving property that does not qualify as bankruptcy estate property for purposes of § 541(a) of the Bankruptcy Code apparently is one of first impression.

An instructive case in this regard is *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982 (3d Cir.1998).

Mr. M. Saleem Muqqadam was an officer of Citicorp Venture Capital ("CVC") as well as a member of the board of directors of debtor Papercraft Corporation. CVC held an equity position in debtor's parent corporation prior to debtor's bankruptcy filing but held no notes issued by debtor. 160 F.3d at 984.

After debtor filed its bankruptcy petition, on behalf of CVC Muqqadam purchased at a discount pre-petition notes issued by debtor in favor of third parties. As a result of the purchases, CVC achieved a "blocking" position in debtor's reorganization. CVC and Muqqadam neither notified nor obtained the approval of debtor's board of directors, the committee, or the bankruptcy court before purchasing the notes. 160 F.3d at 985.

While it was surreptitiously purchasing the notes, CVC requested and obtained confidential information concerning debtor's financial stability and assets, including information that was not divulged to debtor's other creditors. As it accumulated the notes, CVC formulated a rival plan of reorganization in competition with debtor's proposed plan, CVC's plan called for it to purchase debtor's assets. *Id.*

CVC formalized its asset purchase offer by sending a letter to debtor detailing the plan and announcing a financing arrangement with a lender. Shortly before this announcement, Muqqadam informed the committee for the first time that CVC had purchased claims against debtor's estate. CVC's plan was filed along with debtor's plan shortly after the asset purchase offer was disclosed. *Id.* The bankruptcy court ultimately approved debtor's disclosure statement, whereupon CVC withdrew its competing plan and then objected to confirmation of debtor's proposed plan. 160 F.3d at 985–86.

The committee brought an adversary action against CVC in which it objected to allowance of the claims CVC had purchased and requested equitable subordination of its claims. The bankruptcy court found in favor of the committee, holding that CVC had failed to meet its fiduciary obligation to act in the best interest of debtor and its creditors. It held that, under *Brown v. Presbyterian Ministers,* 484 F.2d 998 (3d Cir.1973), the opportunity to purchase the notes was a corporate opportunity of which CVC could not avail itself, consistent with its fiduciary duty, without first notifying the corporation and its creditors and giving them an opportunity to participate.

The bankruptcy court declined, however, to equitably subordinate CVC's purchased claims. It instead articulated and applied a *per se* rule that when an insider purchases a claim at discount without adequate disclosure to the debtor and its creditors, the acquired claims will be limited to the amount paid by the acquiring insider and recovery on the claim will be limited to the percentage distribution provided in the plan for such claims. *Id.*

The District Court agreed on appeal that CVC had acted inequitably and that its behavior was injurious to debtor's creditors. It rejected the *per se* rule articulated by the bankruptcy court, however, and held instead that CVC's recovery should, at a minimum, be limited to the amount CVC had paid for the notes, so as to eliminate any potential profits from purchasing the notes. *Id.*

CVC acknowledged on appeal to the Third Circuit that it and Muqqadam owed a fiduciary duty to the debtor and its creditors. CVC asserted, however, that neither it nor Muqqadam had breached any fiduciary duty. According to CVC, it was not improper *per se* for a fiduciary to purchase claims against a debtor in bankruptcy at a discount. 160 F.3d at 987.

CVC maintained that the opportunity to purchase the notes at a discount was not a corporate opportunity and that prior notice to debtor's board and to the committee was not required because neither debtor nor the committee members had an interest in purchasing the notes.

The Third Circuit concluded, among other things, that CVC's position was fundamentally at odds with its decision in the *Brown* case, 160 F.3d at 987, in which it previously held that the availability of claims for purchase at a discount constituted a corporate opportunity. Noting that a director of a solvent corporation may take advantage of a corporate opportunity only after disclosing the opportunity to the corporation, the *Brown* court concluded that a director of a corporation in bankruptcy also owes a fiduciary duty to creditors and cannot seize an opportunity of the corporation without prior disclosure to the creditors or their representative. A breach of fiduciary had occurred even though the director had purchased a note a discount with the consent of the corporation and its shareholders. 484 F.2d at 1005.

The Third Circuit agreed with the bankruptcy and district courts that CVC had violated its fiduciary duty "in a number of significant respects". That fiduciary duty required CVC to share everything it knew with the debtor's board and with the committee before it began purchasing the notes at a discount. The lack of such disclosure made it "extremely difficult" to say with confidence what would have happened had there been no breach of fiduciary, which itself was a compelling reason for requiring disclosure. 160 F.3d at 988.

The significance of *Citicorp* for our purposes is that the notes Muqqadam purchased on behalf of CVC, like the supportive housing program grant in our case, were *not* property of the debtor's bankruptcy estate. The debtor had no legal or equitable interest in the notes. To the contrary, they were liabilities of the debtor which gave rise to claims against the bankruptcy estate. Muqqadam, in other words, violated the fiduciary duty he and CVC owed to fellow unsecured creditors by engaging in transactions involving something in which debtor had no legal or equitable interest and which therefore was not an asset of the bankruptcy estate.

In saying this we recognize that in *Citicorp* CVC conceded that it owed a fiduciary duty to debtor's creditors while denying that it was improper *per se* for a fiduciary to purchase at a discount claims against the bankruptcy estate. 160 F.3d at 987. In our case WHO steadfastly denies that it owed a fiduciary to fellow unsecured creditors concerning the supportive housing program grant *because* it was not property of the bankruptcy estate.

We believe that the outcome in *Citicorp* would have been the same even if CVC had not conceded that it and Muqqadam owed a fiduciary duty to debtor's creditors. The court would have found nonetheless that CVC and Muqqadam were fiduciaries by virtue of their *status* as representative on the creditors' committee. Muqqadam, who also was a member of debtor's board of directors, owed a fiduciary duty as a result of his *relationship* to debtor and its creditors. His status as fiduciary, in other words, was not dependent on whether the debtor in that case had a legal or equitable interest in the notes that were the subject of the transactions at issue there.

This last point is highly significant for our case. WHO undoubtedly was a fiduciary owing a duty to fellow unsecured creditors by virtue of its status as member of the creditors' committee. Whether debtor had a legal or equitable interest in the supportive housing program grant has no bearing on whether WHO violated that

duty when it replaced debtor as the program grantee.

WHO asserts that *Citicorp* is distinguishable from our case in a critical respect. The debtor in *Citicorp* could have "owned" the notes and made them property of its bankruptcy estate by purchasing the notes. The supportive housing program grant, by contrast, could never become property of this debtor's bankruptcy estate.

While WHO is correct in noting this distinction, we view it as a distinction without a difference. Whether the debtor in *Citicorp* could or could not have acquired a property interest in the notes had no bearing on whether Muqqadam violated his fiduciary duty. The outcome would have been the same even if the debtor in *Citicorp* could not have purchased them. The question as to whether the debtor could purchase the notes at all was not relevant to the outcome. Had WHO remained faithful to its fiduciary obligation, it could and should have renounced its stealthy, self-serving activities and encouraged debtor to reorganize by utilizing the same or similar individuals that usurped the opportunity to execute the contract on behalf of debtor. In that way, debtor could have reorganized and paid its unsecured creditors

We conclude in light of the foregoing that WHO owed a fiduciary duty to fellow unsecured creditors concerning the supportive housing program grant even though the grant was not—and could have become—property of debtor's bankruptcy estate for purposes of § 541(a) of the Bankruptcy Code.

### Did WHO Breach Its Fiduciary Duty To Fellow Unsecured Creditors?

Having determined that WHO owed a fiduciary duty to fellow general unsecured creditors with respect to the supportive housing grant even though the grant was not property of debtor's bankruptcy estate, it remains for us to determine whether WHO breached this fiduciary duty when it succeeded debtor as the grantee instead of seeking first to have debtor reinstated as the grantee.

Members of a creditors' committee owe a fiduciary duty to the committee's constituents—i.e., the class of general unsecured creditors in general. *In re PWS Holding Corp.*, 228 F.3d at 246. The primary purpose of such a committee is to maximize distribution to the class. *In re Nationwide Sports Distributors, Inc.*, 227 B.R. at 463.

As fiduciaries, members of a committee have obligations of fidelity, undivided loyalty, and impartial service in pursuing the interests of the class whom they represent. *United Steelworkers of America v. Lampl (In re Mesta Machine Co., Inc.)* 67 B.R. 151, 156–57 (Bankr. W.D.Pa.1986). The standard of conduct to which they are held is "[n]ot honesty alone, but the punctilio of an honor the most sensitive". *In re Mountain States Power Co.*, 118 F.2d 405, 407 (3d Cir.1941).

In particular, a committee member may not use its position on the committee to advance its own individual interests. *In re Haskell–Dawes, Inc.*, 188 B.R. at 522. A committee member violates this duty by taking action that furthers its own self-interest to the potential detriment of those whom they represent. *Westmoreland Human Opportunities*, 246 F.3d at 256.

WHO advanced its own parochial interest to the detriment of those creditors whose interests it was obligated to advance when it had itself named as the supportive housing program grantee without first seeking to have debtor reinstated as the grantee. WHO was named as successor grantee by the mere expedient of having

Adelphoi write a letter to HUD recommending WHO.

Had WHO suggested to Adelphoi that Adelphoi recommend debtor's reinstatement as grantee, we have little doubt that HUD would have reinstated debtor. The individuals involved in executing this contract post-assignment were the same individuals executing it previously. WHO did not so request because WHO and Adelphoi had devised a scheme whereby they would divide the spoils of the supportive housing program. They agreed that WHO would replace debtor as the grantee while Adelphoi would purchase 49 Division Street and then lease it to WHO as a venue for the program.

At trial WHO sought to depict itself as having acted as it did for altruistic reasons. According to WHO, it succeeded debtor as the grantee to keep HUD from terminating the grant altogether and thus depriving needy residents of Westmoreland County of the benefits of the grant. We are not persuaded that such a lofty motive drove WHO to act as it did.

To begin with, we doubt that WHO had to step into the breach and become the grantee to prevent HUD from terminating the grant altogether. While the grant was for a term of only three years, there was testimony at trial that HUD routinely renewed such grants for additional terms barring gross malfeasance of misfeasance on the part of the grantee. HUD indicated a willingness to have debtor submit a plan and pursue this grant. This willingness continued even after its initial overtures were ignored. We determine that it is at least likely that HUD would have reinstated debtor as the grantee had WHO made an effort to have debtor reinstated.

Neither are we persuaded that WHO derived no personal benefit from succeeding debtor as the grantee. To the contrary, WHO enjoyed a substantial benefit.

In addition to gaining access to the balance of the funds available under the grant that debtor had not drawn down—approximately $977,000—during the remainder of the grant term, WHO also received $51,399 to cover administrative overhead. WHO was permitted to use these funds to pay staff salaries without having to show that a specific employee worked on the supportive housing program. In other words, WHO received payment for staff salaries when no additional staff was needed or added. It is our understanding that HUD has renewed the grant and that WHO continues to receive such funds with which to pay its employees. If WHO and Adelphoi can successfully execute this grant for themselves then surely they could execute it for debtor.

Not only did WHO's conduct further its own self-interest, it also was detrimental to fellow general unsecured creditors. For instance, the failure to have debtor reinstated as the grantee resulted in additional general unsecured claims by matching fund contributors. This in turn increased the total amount of general unsecured claims and accordingly decreased the amount other members of that class received by way of distribution. Debtor's confirmed liquidating chapter 11 plan provided that general unsecured creditors would be paid the full amount of their allowed claims "to the extent of funds available".

We conclude in light of the foregoing that WHO breached its fiduciary obligation to fellow general unsecured creditors when it arranged to have itself named as the successor grantee of the supportive housing program. The result was that WHO furthered its self-interest while reducing rather than maximizing distribution to the class of general unsecured creditors as a whole.

We further believe that the appropriate remedy for WHO's breach of its fiduciary duty was set forth in the memorandum opinion issued on April 25, 1999. The chapter 11 trustee is entitled to recover the full amount of the allowed unsecured claims by matching fund donors totaling $84,254 plus administrative overhead payments in the amount of $51,399 remaining from the initial grant when WHO took it over. A judgment in the amount of $135,653 ($84,254 + $51,399 = $135,653) in favor of the chapter 11 trustee and against WHO shall issue.