WESTMORELAND HUMAN
OPPORTUNITIES, INC.,
Appellant,

v.

James R. WALSH, Trustee of the
Bankruptcy Estate of Life Service Systems, Inc., Appellee.

Civ.A. No. 1999–110J.

United States District Court,
W.D. Pennsylvania.

July 29, 2005.

Terance O'Halloran, Greensburg, PA, Joseph S. Sisca, Office of the United States Trustee, Pittsburgh, PA, P. Matthew Sutko, Office of the General Counsel, Washington, DC, for Appellee.

Daniel B. Pagliari, Paletta & Pagliari, Lower Burrell, PA, for Appellant.

James R. Walsh, Spence, Custer, Saylor, Wolfe & Rose, Johnstown, PA, pro se.

### MEMORANDUM OPINION and ORDER

GIBSON, District Judge.

■ This matter comes before the Court on Westmoreland Human Opportunities, Inc.'s (WHO/Appellant) appeal from the Order of the Bankruptcy Court dated June 20, 2002 entering judgment in favor of James R. Walsh, Trustee of the Bankruptcy Estate of Life Service Systems, Inc. (Appellee) against WHO in the amount of $135,653.00. The Court has jurisdiction over this appeal in accordance with 28 U.S.C. § 158(a)(1). Our review of the Bankruptcy Court's findings of fact is guided by the legal standard of "clearly erroneous" and the Bankruptcy Court's legal conclusions are subject to plenary review. *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3rd Cir. 1989).

There exist four issues that are presented for the Court's review: 1) whether a fiduciary duty can arise among members of an unsecured creditors committee in connection with a transaction involving property that falls outside of the debtor's bankruptcy estate? and 2) whether such a fiduciary duty exists under the circumstances of this case where WHO, a member of the unsecured creditors committee, acted to take control of that property? 3) whether WHO breached that duty? and 4) whether the Bankruptcy Court awarded proper damages as a result of that breach? Each successive issue is addressed only if the prior issue has been answered in the affirmative.

Previously, the Court of Appeals remanded this matter to this Court for the purpose of having this Court determine "whether a fiduciary obligation to Committee members can arise in connection with a transaction involving property that falls outside of the debtor's bankruptcy estate." *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 257 (3rd Cir.2001). The Court of Appeals found that the previous analyses of the Bankruptcy Court and the District Court were incomplete in that these courts did not consider if a fiduciary duty exists between an unsecured credi-

tors committee member and the unsecured creditors committee when that committee member engages in a transaction involving debtor's property that is not part of the bankruptcy estate. *Id.* On remand, the Bankruptcy Court concluded that a fiduciary duty does exist between a committee member and an unsecured creditors committee in relation to that committee member's actions regarding a transaction involving debtor's property not considered part of the bankruptcy estate. *Walsh v. Westmoreland Human Opportunities, Inc. (In re. Life Service Systems, Inc., Debtor)*, 279 B.R. 504 (Bankr.W.D.Pa.2002) The appeal *sub judice* was filed on July 24, 2002; briefing was completed on September 17, 2002; and this appeal was assigned to this Court on October 27, 2003.

Because this Court does not find the Bankruptcy Court's findings of fact to be clearly erroneous in any way, such findings will be reproduced here for purposes of our plenary review of the Bankruptcy Court's conclusions of law:

Debtor Life Service Systems, Inc. and defendant WHO are non-profit corporations which operate various community and social services programs for residents of Westmoreland County, Pennsylvania.

Debtor endeavored in 1995 to provide transitional housing for homeless families residing in Westmoreland County while they sought permanent housing and learned necessary skills for living.

In April of 1995, debtor submitted a request to United States Department of Housing and Urban Development ("HUD") for a grant under the federal Supportive Housing Program. Recipients of such grants are selected through a time-consuming nationwide competitive process. See 42 U.S.C. § 11386(b). As part of the process, debtor was required to submit an application and pro-

ject proposal providing detailed information concerning the proposed housing project, debtor's past experience in providing housing assistance, and a budget for the project. While there is an obvious cost to this submittal, no party has offered the details of same.

In its application, debtor requested funding in the amount of $1,326,925 to cover the cost of acquiring, rehabilitating, and operating two apartment buildings. The cost of providing supportive services offered at these sites and a five percent fee to cover debtor's administrative overhead were also included.

HUD advised debtor in August of 1995 that it had preliminarily approved debtor's request for funding in the exact amount requested. Final approval was contingent upon completion of an acceptable technical submission. Debtor did as required and in the process expended additional blocks of time and resources putting together a final submission that was acceptable to HUD.

On February 6, 1996, HUD gave final approval for a transitional housing project to be located at 49 Division Street in Greensburg, Pennsylvania. Several days later, debtor and HUD executed a formal grant agreement which obligated HUD to provide $1,326,925 for the Division Street property and which obligated debtor to administer the project at that site. The grant was for a term of three years and was subject to renewal.

Debtor purchased the Division Street property shortly after executing the agreement and began renovating it. The purchase price was $295,000.

As a precondition to receiving funds under the grant, debtor was required to obtain matching funds from others sources totaling $295,000. In addition to pledging $20,000 of its own money, debtor obtained pledges from Westmoreland

Housing Authority ($25,000), United Way ($100,000) and Richard K. Mellon Foundation ($150,000). Debtor used these matching funds to complete renovations.

Only a few months after entering into the above agreement with HUD, debtor began experiencing what has [sic] been termed "financial and administrative problems". Little or no detail was offered as to the nature of these "problems". In an effort to overcome these "problems", debtor entered into an agreement with WHO in September of 1996 whereby WHO was to provide management assistance to debtor. While serving in this capacity, WHO learned the intimate details of debtor's operations, including the specifics of the above grant agreement with HUD.

The relationship between debtor and WHO was short-lived. WHO abruptly terminated it in October of 1996, for reasons that are not clear.

After WHO pulled out, debtor retained Adelphoi, Inc., another non-profit organization operating in Westmoreland County, to manage debtor and to conduct its day-to-day operations. Pursuant to the terms of the agreement, all of debtor's board members resigned and were replaced by directors selected by Adelphoi.

On January 14, 1997, approximately two months after Adelphoi had taken over managing debtor's affairs, debtor filed a voluntary chapter 11 petition. The decision to do so was made by the newly-appointed board of directors Adelphoi had selected.

WHO was listed on the accompanying schedules as having a general unsecured claim for management services it had provided in September and October of 1996. Also listed as creditors were matching fund grantors Westmoreland

County Housing Authority ($3,798), United Way ($57,631), and Richard K. Mellon Foundation ($22,825). It is the custom of debtors filing under chapter 11 of the Bankruptcy Code in this district to schedule assets that it considers are not assets of the bankruptcy estate for the purpose of completeness and for informational purposes. The theory behind this practice stems from the fact that the bankruptcy petition is executed under penalty of perjury and Rule 9011 and the Bankruptcy Bar is sensitive to the charge of impropriety. Debtor's interest in the supportive housing program grant was not listed on its schedules.

By the time of the bankruptcy filing, debtor had drawn down approximately $288,000 in grant funds.

An official committee of unsecured creditors was constituted shortly after the bankruptcy filing. A representative of WHO served on the committee until September of 1997, when it withdrew amid accusations of a conflict of interest. WHO apparently was sharing confidential information with third parties having an interest adverse to debtor's other unsecured creditors.

At the time of or shortly after debtor filed its bankruptcy petition, WHO and Adelphoi devised a scheme whereby they would divide the spoils of the supportive housing grant. Adelphoi would purchase the property located at 49 Division Street at a future sale to take place in this court. WHO would replace debtor as the supportive housing grantee and would house program participants at 49 Division Street.

The parties acted as if they could merely direct the actions of HUD and HUD would strictly follow those directions. As future events showed, in this instance they were correct.

Two weeks after debtor filed its bankruptcy petition, HUD declared debtor to be in default of the provisions of the supportive housing grant. HUD informed debtor by letter dated January 28, 1997, that it was in default as a result of the bankruptcy filing. HUD asserted that debtor would receive no further grant disbursements and stated that the grant would be reactivated if debtor submitted a "workable plan". HUD further stated that it would cancel the remainder of the grant or might select someone else to administer it if a suitable plan was not proposed within thirty days.

Firmly under the control of the directors hand-picked by Adelphoi, debtor made no attempt during this thirty-day window of opportunity to submit a "workable plan" to HUD or to notify the members of the creditors' committee of HUD's letter.

Even though debtor did not respond within the thirty-day period, HUD did not terminate the grant or replace debtor at that time as the grantee. It instead sent another letter to debtor on March 4, 1997, inviting debtor to submit a "work-out plan for the continued implementation of the project".

As was the case with HUD's previous letter, debtor did not respond. Adelphoi's executive director instead sent a letter to HUD on March 17, 1997, directing that the supportive housing grant be reactivated. The letter stated that "our intentions are to transfer the property [located at 49 Division Street] to Adelphoi, Inc. The program will be run by Westmoreland Human Opportunities".

Without having to undergo the rigors of the complex application process through which debtor had gone to get the supportive housing grant, WHO was immediately "chosen" by HUD to replace debtor as the grantee. On May 27, 1997, HUD and WHO executed an "amendment" to the grant agreement which identified WHO as "successor to Life Systems Services, Inc." The property located at 49 Division Street was identified as a venue for the program.

WHO paid no consideration to the bankruptcy estate for the right to succeed debtor as the grantee. Moreover, neither debtor nor WHO notified the committee of unsecured creditors or the court of this "amendment".

Debtor brought a motion in August of 1997 to sell the property located at 49 Division Street to a non-profit entity known as Westmoreland CHODO. The fact that CHODO was an affiliate of and controlled by Adelphoi was not disclosed in the motion.

The committee, which had no knowledge of the above "amendment", objected to the sale. It argued that the sale should be linked with a court-approved assignment of the supportive housing grant to a third party to ensure that debtor's expenditure of funds on 49 Division Street did not give rise to a claim by HUD to recapture funds debtor had already expended on the property. The supportive housing grant required debtor to use the property for supportive housing for a period of twenty years. In the event it was not so used, any amounts debtor had expended on the property were to be returned to HUD.

The understanding between WHO and Adelphoi whereby Adelphoi would purchase 49 Division Street while WHO would take over the supportive housing grant and house eligible participants there came to nought when a third party outbid CHODO at the sale and purchased the property. WHO suddenly was not interested in dealing with this

third party and instead housed eligible participants at another location.

A motion to appoint a chapter 11 trustee was filed on October 27, 1997. Largely based upon recently divulged facts, the motion was granted on November 7, 1997.

Debtor's liquidating chapter 11 plan of reorganization subsequently was confirmed. The plan provided for payment in full to general unsecured creditors "to the extent funds are available". This qualifying phrase implied that general unsecured creditors would not necessarily be paid in full after all. They have not been paid in full to date and most likely never will be.

The chapter 11 trustee brought this adversary action against WHO on February 6, 1998. The complaint alleged that the supportive housing grant was property of debtor's bankruptcy estate and that WHO had breached its fiduciary duty to other unsecured creditors by replacing debtor as the program's grantee without first obtaining court approval. WHO responded that it had not breached its fiduciary duty because debtor's interest in the supportive housing grant was never property of the bankruptcy estate for purposes of the Bankruptcy Code.

The chapter 11 trustee also brought separate adversary actions against Adelphoi and debtor's directors whom Adelphoi had selected. Among other things, the chapter 11 trustee claimed that they had breached their fiduciary duty in connection with WHO's succession to the supportive housing grant. Both of these actions settled before going to trial.

Judgment in the amount of $135,653 was entered in this case in favor of the chapter 11 trustee after a trial. We found that debtor's interest in the supportive housing grant was property of the bankruptcy estate and that WHO had breached its fiduciary duty to fellow general unsecured creditors when it assumed debtor's rights under the supportive housing program grant.

WHO appealed the judgment to the district court, where it argued that we had erred in finding that debtor's interest in the grant was property of its bankruptcy estate. The District Court agreed with the finding and affirmed the judgment, whereupon WHO filed a timely appeal with the United States Court for the Third Circuit.

The Third Circuit reversed and remanded after determining that debtor's interest in the grant was not property of its bankruptcy estate. *Westmoreland Human Opportunities v. Walsh,* 246 F.3d 233, 241–256 (3rd Cir.2001). It concluded, however, that this determination did not fully "dispose of the merits" of this case. Remaining to be determined was the question whether WHO had breached its fiduciary duty to fellow general unsecured creditors when it assumed debtor's interest in the grant without so notifying the other members of the creditors' committee. 246 F.3d at 256–57.

Our analysis as well as that of the District Court, it concluded, was "incomplete" because neither court had considered whether a fiduciary obligation to fellow committee members "can arise in connection with a transaction that falls outside of the debtor's bankruptcy estate". 246 F.3d at 257. The Third Circuit declined to decide the question because neither this court nor the District Court had considered it in the first instance and because neither WHO nor the chapter 11 trustee had fairly raised the question on appeal. *Id.*

The Third Circuit instead remanded the matter to the District Court, which

in turn remanded it to this court for further proceedings to resolve the following issues: (1) whether a fiduciary obligation to fellow unsecured creditors can arise out of a transaction involving an item of property that does not qualify as property of the estate for purposes of the Bankruptcy Code; and (2) if it can so arise, whether WHO breached such a fiduciary duty based on the specific facts of this case. 246 F.3d at 258.

*Walsh v. Westmoreland Human Opportunities, Inc.*, 279 B.R. 504, 506–509 (Bankr. W.D.Pa.2002).

The Bankruptcy Court on remand concluded that a fiduciary relationship among unsecured creditors committee members extends to transactions a committee member may engage in which concern property not considered part of the bankruptcy estate, and more specifically, that a breach of such fiduciary duty occurred in this case. The Court will now conduct a plenary review of the Bankruptcy Court's legal analysis and conclusions.

Starting with an understanding of the role of the unsecured creditors committee under Chapter Eleven bankruptcies, the Bankruptcy Court recognized that the question of the existence of a fiduciary duty between committee members regarding a transaction dealing with property of the debtor that falls outside of the debtor's bankruptcy estate (nonstate property) appeared to be one of first impression. *Walsh v. Westmoreland Human Opportunities*, 279 B.R. 504, 510 (Bankr.W.D.Pa. 2002). The Bankruptcy Court then proceeded to review the case of *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3rd Cir.1998) (hereinafter *"CVC"* in reference to the opinion and "CVC" used in reference to Citicorp Venture Capital Corporation as a party) because it found it instructive on this issue of whether a fiduciary duty arises with regard to nonstate property.

In *CVC*, a member of the board of directors of the debtor, Muqqadam, held an officer position at CVC; CVC held equity in the debtor's parent corporation. *Walsh* at 511. CVC purchased discounted notes of the debtor after the debtor filed its bankruptcy petition and thereby obtained a " 'blocking' position in [the] debtor's reorganization." *Walsh* at 511. The Third Circuit concluded that even though Muqqadam purchased the discounted notes on behalf of CVC with the permission of the debtor and its shareholders, it did not disclose the opportunity for that purchase to the debtor's creditors prior to making the purchase. As a result, a breach of fiduciary duty occurred from CVC's actions in seizing a corporate opportunity without prior disclosure. On remand, the Bankruptcy Court found *CVC* significant for the fact that the notes at issue in *CVC* were not property of the bankruptcy estate ("estate") yet a violation of fiduciary duty still occurred for dealing with this nonstate property. *Walsh* at 512. The Bankruptcy Court reasoned that even though CVC conceded that a fiduciary relationship existed between itself/Muqqadam and the creditors, such a conclusion would have been reached by the Third Circuit in the absence of such a concession. *Id.* The court reasoned as such because CVC/Muqqadam was a representative on the creditors committee and Muqqadam also was a member of the debtor's board of directors and from such positions a fiduciary status existed; a fiduciary status did not exist from the fact that CVC/Muqqadam had any interest, legal or equitable, in the notes purchased after the petition's filing. *Id.* The Bankruptcy Court rejected WHO's argument to distinguish the case *sub judice* from *CVC* by the fact that the notes in *CVC* could have been bought by

the debtor in that case while the debtor in the case *sub judice* could not own the grant at issue here. *Walsh* at 513. The Bankruptcy Court's rejection of this argument is based upon the logic that the ability to own the property at issue is not relevant to a violation of the fiduciary duty because the actions taken by WHO, just like those of CVC, violated the fiduciary duty it owed to its fellow committee members. *Id.*

On remand, the Bankruptcy Court went on to conclude that WHO did violate its fiduciary duty as its actions benefitted itself and were damaging to the "general unsecured creditors" because those entities which had matched the grant from HUD filed general unsecured claims when the debtor was not reinstated with the grant. *Walsh* at 514. In turn, a larger unsecured creditor class results in each member of that class receiving less of a recovery. *Id.* The Bankruptcy Court concluded that its calculation of damages in its memorandum opinion of April 25, 1999 was correct and that the amount of $135,653 should be entered as the amount of judgment against WHO. *Walsh* at 515. According to the Bankruptcy Court on remand, this amount reflected $84,254 in unsecured claims by the "matching fund donors" and $51,399 of "administrative overhead payments" left within the grant funds at the point of WHO's assumption of the grant. *Id.*

The Court notes at the outset that for the majority of its opinion the Bankruptcy Court referred to the first issue on remand as one concerning whether a fiduciary obligation between *unsecured creditors* exists with regard to nonstate property although it had correctly noted the issue on remand prior to beginning its discussion. *Walsh v. Westmoreland Human Opportunities,* 279 B.R. 504, 509–513 (Bankr. W.D.Pa.2002). This Court understands the opinion of the Court of Appeals to frame the first issue on remand as being whether a member of the general unsecured creditors committee owes a fiduciary duty to other members of that committee in regard to its actions taken as to debtor's property that is not part of the debtor's bankruptcy estate. While it is true that the members of the committee are all unsecured creditors, the Court does not understand the remanded issues to concern the question of whether there exists a fiduciary duty between members of the general unsecured creditors committee because of their membership in that class of creditors. However, the Court finds that such misstatement of the issue in discussion did not affect the Bankruptcy Court's analysis.

WHO makes several arguments against the decision of the Bankruptcy Court. First, WHO argues that all of the parties were aware of the fact that WHO was succeeding the debtor in the HUD grant and that various facts support this contention; WHO claims it was following the direction of HUD with the understanding that the Bankruptcy Court did not need to approve WHO as the successor to the grant. Appellant's Brief, p. 11–13. The Court rejects these contentions as it was determined previously in this opinion that no clear error was found in the facts as determined by the Bankruptcy Court and therefore, the Court finds that notice of WHO's succession came to the committee in the fall of 1997, not Spring of 1997 as claimed by the Appellant.

WHO's second argument is that when property is not part of the debtor's bankruptcy estate under 11 U.S.C. § 541, a fiduciary duty cannot arise as to such property. Specifically, WHO argues that the Bankruptcy Court's reliance on *CVC* is misplaced because the property purchased in that case (promissory notes) was prop-

erty that the debtor could have made property of the estate pursuant to § 541 while the property at issue in the case *sub judice,* a HUD grant, could not be made property of the estate. WHO argues for an exception to such nonestate grants giving rise to a fiduciary duty as such an exception would be very narrow and noticeable to any unsecured creditors committee and further, the Bankruptcy Code does not control the ability of creditors to "transfer or receive non-estate property" according to the precedent of *In re SPM Mfg. Corp.,* 984 F.2d 1305 (1st Cir.1993). Appellant's Brief, p. 14.

Carving out federal grants as an exception to the existence of a fiduciary duty where the property involved is like the one at issue serves no purpose under the Code, but only serves the purpose of facilitating WHO's avoidance of the judgment it must pay in this matter. To judicially countenance WHO's surreptitious activity would cut against the purpose of the fiduciary duty which exists among the committee members as well as the fiduciary duty which those committee members have to their constituents. To self-deal with assets of the debtor which are not part of the bankruptcy estate, the status of which can effect the amount of recovery of unsecured creditors because of the potential of adding members to the class of unsecured creditors as well as having the potential to prevent an increase of the assets of the estate, clearly affects the estate and the interests of the unsecured creditors. As for the precedent of *SPM Mfg. Corp.,* 984 F.2d 1305, 1313 (1st Cir.1993) which recognized that "[t]he Code does not govern the rights of creditors to transfer or receive nonestate property" the property at issue in *SPM* was in fact proceeds of the liquidation of the debtor's assets that had been distributed by the Court. In accordance with the plan in *SPM,* priority status was given to the secured creditor, Citizens Sav-

ings Bank (Citizens). After the disbursement order of the Court, Citizens attempted to effectuate a division of the proceeds which it received with general unsecured creditors.

*SPM* is inapposite to the case *sub judice* where the actions of WHO while it was a member of the unsecured creditors committee, were taken in order to obtain nonestate property that could have been obtained by the debtor except for the surreptitious actions of WHO's partner, Adelphoi, which controlled the debtor's board of directors and caused the debtor not to respond to HUD's offer to continue the grant under a new plan. Had the debtor chosen to respond to HUD's offer, the number of general unsecured creditors would have been fewer. This is because the matching grantors of the HUD grant joined in the bankruptcy action as unsecured creditors after the debtor did not continue with the HUD grant. This in turn resulted in more unsecured creditors which causes the recovery of each unsecured creditor to become less. Furthermore, the failure of the debtor to continue the grant resulted in a loss of direct income to the debtor, thereby lessening the amount of the estate. All of these consequences occurred as a result of WHO's actions prior to confirmation of a plan and a final decree.

In contrast, *SPM* concerned circumstances where a Chapter Eleven bankruptcy was converted into a Chapter Seven bankruptcy followed by an agreement that was operative after the distribution of proceeds to the secured creditor whereby the secured creditor agreed to terms with members of the unsecured creditors committee pursuant to which the secured creditor consented to distribute part of its recovery to the unsecured creditors. The *SPM* agreement concerned nonestate property because of the fact that distribu-

tion had occurred under Chapter Seven bankruptcy. The First Circuit concluded that such action was permissible after distribution to the secured creditor because the monies distributed to the secured creditor were no longer part of the estate. The secured creditor could thereafter do what it wanted with the money it received without restriction of the Bankruptcy Code or court orders.

The case *sub judice* is different in many respects, particularly since it was not converted from Chapter Eleven bankruptcy to Chapter Seven bankruptcy and a plan had not been confirmed at the time WHO succeeded the debtor in the HUD grant.[1] A liquidating plan was subsequently confirmed months after WHO succeeded to the HUD grant. However, WHO's actions, in concert with Adelphoi, directly and indirectly affected the size of the class of unsecured creditors and the resulting distribution of proceeds under the liquidation plan. The action of Citizens, as the secured creditor in *SPM,* had no such effect on the size of the unsecured creditor class or on the amount of the recovery of each unsecured creditor as Citizens was entitled to all of the proceeds in satisfaction of its secured claim. Instead, Citizens chose to enter into an agreement to facilitate some recovery to the unsecured creditors by giving back proceeds under an agreement that would take effect upon Citizens taking possession of the secured proceeds. WHO's actions were much more self-serving in that its actions were taken before a plan was in place and it dealt with nonestate property in ways that adversely affected bankruptcy estate property and compounded the bankruptcy proceedings by preventing income from being infused into the estate by means of the continuation of the grant that was almost certain to

occur; this conclusion concerning the continuation of the grant is based upon an understanding of HUD's practices and their specific communications to the debtor to work out a plan that would allow the grant to be continued. WHO's assumption of the grant in turn caused the debtor's matching creditors to file claims against the estate thereby becoming members of the class of unsecured creditors.

In the absence of prior disclosure to the members of the unsecured creditors committee and where their consent is not obtained, then when the actions of a member of the unsecured creditors committee in dealing with nonestate property cause a loss of income to the debtor or debtor in possession, a lower amount of recovery for its fellow general unsecured creditors, an increase in the size of the class of general unsecured creditors, or otherwise adversely affect the orderly and efficient resolution of the bankruptcy petition or satisfaction of claims that is not in accord with the interests and duties of the committee of general unsecured creditors, this Court finds that a breach of the fiduciary duty which that member owes to the committee of general unsecured creditors has been committed. The Court will now explore the basis and nature of such a fiduciary duty.

 WHO's third argument is that the test applied to evaluate a usurpation of a corporate opportunity in the corporate law context cannot be applied to evaluate a breach of fiduciary duty between members of the unsecured creditors committee. In particular, WHO is referring to the application by the Bankruptcy Court of the test for breach of fiduciary duty found in the case of *CVC.* A review of *CVC* reveals the fiduciary duty at issue in that case was one

---

1. With some exceptions, it is noted that confirmation of a plan effects a discharge of the debtor from debts incurred prior to the date of confirmation. 11 U.S.C. § 1141(d)(1).

originating from an insider position with the debtor, *i.e.*, a director of the debtor corporation. The Court understands WHO's argument and agrees that a fiduciary duty arising from one's position as a corporate director differs from the fiduciary duty arising as a result of membership on an unsecured creditors committee. However, the fiduciary duty in each of those situations is somewhat similar. While creditors may certainly continue to do business while serving as members of the unsecured creditors committee, their membership on the committee is not intended to provide them with inside information concerning property of the debtor to be used for personal gain, whether that inside information concerns property which is part of the estate or not. While the Court finds the *CVC* case instructive on this point, its analysis cannot be completely transposed to this case which concerns the duties of an unsecured creditors committee member. The Bankruptcy Court determined that in the absence of the stipulation that Muqqadam/CVC owed a fiduciary duty to the creditors, the *CVC* court would have recognized the existence of a fiduciary duty owed by Muqqadam/CVC by virtue of their position on the committee. The Court does not agree. The Court reads the *CVC* analysis of fiduciary duty as one based upon Muqqadam/CVC's position on the board of directors of the debtor, not the creditors committee. Treating the fiduciary duty applicable to corporate boards of directors to be equivalent to the fiduciary duty applicable to committees of unsecured creditors is unworkable. Such was pointed out in the case of *Krafsur v. UOP*, 196 B.R. 58, 73–75 (Bankr.W.D.Tex.1996). However, because the Court finds that a corporate fiduciary duty cannot be imposed in its entirety upon members of a creditors committee, that does not mean that a member of an unsecured creditors committee can act solely in its own self interest without any restriction resulting from the fiduciary duty which arises from being a member of that committee. While the Court does not agree entirely with the Bankruptcy Court in its application of *CVC* to the case *sub judice*, the Court does agree with its conclusion that a fiduciary duty was breached based on the following reasoning.

In *Krafsur*, the bankruptcy court evaluated an issue very similar to the issue which is present in the case *sub judice*, but in the context of a request for equitable subordination. *Krafsur* at 73–74. The court in *Krafsur* recognized that a creditors committee member has the dual role of "deal[ing] fairly with other creditor members of the represented class" while also concerning itself with its own interests of recovery and minimizing its loss in a bankruptcy proceeding. *Krafsur* at 74. The *Krafsur* court concluded that the application of the "corporate usurpation test" to committee members would result in a loss of creditors willing to serve on the committee as the test's application would increase the scrutiny of every decision of a committee member. *Id.* The *Krafsur* court went on to conclude that a breach of fiduciary duty, although the extent of the duty imposed was undefined by the court, did not occur as the challenged actions were taken based upon information secured independent of information obtained by the creditor through its membership on the committee. *Krafsur* at 74–75. The court found that the existence of a conflict between a member's duty to the committee and its ability to continue its own business should not always result in a finding of a breach of fiduciary duty and in instances of such conflict, a member's "duty to the committee" should not always supercede the member's interest in continuing its business and the opportunities presented

to it. *Krafsur v. UOP,* 196 B.R. 58, 75 (Bankr.W.D.Tex.1996).

It is clear that the unsecured creditors committee represents the unsecured creditors. To be effective in that representation, it is necessary for the committee to speak with one voice. To permit the committee members to serve their individual interests in a manner which is detrimental to other unsecured creditors would not only violate their established fiduciary duty to their constituents, the unsecured creditors, but also frustrate the purpose behind the committee's mandatory existence under the Bankruptcy Code. See 11 U.S.C. § 1102 (requiring U.S. Trustee to appoint committee). In essence, the existence of a fiduciary duty that exists on a "vertical" level between the many unsecured creditors and the members of the unsecured creditors committee cannot be effectuated and preserved if such a fiduciary duty does not also exist on a "horizontal" level among the members of that committee. The committee is empowered under the Bankruptcy Code to take certain actions for the benefit of the class of unsecured creditors that it represents: the power to hire counsel and other agents, investigate the financial state of the debtor, request the appointment of a trustee or examiner, file adversary proceedings under certain circumstances, and take part in the formulation of the reorganization plan. *See* 11 U.S.C. § 1103; *In re Fugazy,* 150 B.R. 103 (Bankr.S.D.N.Y.1993)(recognizing that a creditors committee may have an implied right to originate adversary proceedings in the interest of the debtor's estate). In addition, the committee members are entitled to immunity for their actions performed in their official capacity in accordance with the Bankruptcy Code. *In re L.F. Rothschild Holdings, Inc.,* 163 B.R. 45 (S.D.N.Y.1994).

Reflection upon the fact that the members of the unsecured creditors committee are in fact selected from the class of unsecured creditors strengthens the rationale for the existence of a fiduciary relationship among the committee members as they are serving each other as well as the unsecured creditors not selected as members of the committee. See 11 U.S.C. § 1102(b)(1). *See also In re ABC Automotive Products Corp.,* 210 B.R. 437, 441 (Bankr.E.D.Pa.1997)(recognizing the committee must act with "undivided loyalty for the benefit of all of the unsecured creditors."). This is not to say that the members of the committee (and unsecured creditors in general) are somehow precluded from acting in their respective financial interests related to the bankruptcy estate or from continuing their own business, but being a member of the committee is not a position given to an unsecured creditor for the primary purpose of furthering its own financial interests. *See Matter of Enduro Stainless, Inc.,* 59 B.R. 603, 605 (Bankr. N.D.Ohio 1986). Membership on the committee is not intended to grant to the members a financial advantage or priority over their constituents. Good faith, trust and candor are essential to ensure that the work of the committee does not come to a standstill and is completed for the benefit of all unsecured creditors. On this basis, the Court believes that a fiduciary duty exists between all members of an unsecured creditors committee.

Therefore, the Court rejects the Bankruptcy Court's adoption of a fiduciary duty entirely identical to the fiduciary duty required of a corporate director and officer such as is found in *CVC,* and adopts the reasoning above as to the basis of a fiduciary duty among committee members. The Court analysis above is an attempt to further explain this fiduciary duty that was originally recognized by the Third Circuit in *Walsh,* 246 F.3d 233, 257 (3rd

Cir.2001)(citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3rd Cir.2000)) and based upon the grant of authority under 11 U.S.C. § 1103(c)(5) which grants a committee the power to "perform such other services as are in the interest of those represented." However, the Third Circuit in *Walsh* did not address the application of this fiduciary duty with regard to dealings by committee members with nonstate property. The Court feels it necessary to utilize our fiduciary duty analysis above to explain the boundaries of the fiduciary duty recognized by the *Walsh* Court in order to answer the central question that necessitated remand of this matter: was this fiduciary duty breached when WHO, a member of the unsecured creditors committee, assumed the debtor's interest in the nonestate property? *See* p. 569, *supra.* For purposes of this question, the Court need only address the limits and the reach of this fiduciary duty with respect to the property in question in the case *sub judice.* The Court finds that WHO's actions violated this fiduciary duty. The Court believes that notice and the opportunity to object to WHO's intentions were required to be given to the unsecured creditors committee, and to the debtor, due to its interest in the nonestate property, and that the approval of the Bankruptcy Court was required to be obtained prior to WHO's succession to the grant because of the impact of that action upon the interests of creditors in the Bankruptcy litigation.[2] The Court's reasoning for this con-

clusion is the effect that WHO's succession to the nonestate property had upon the recovery by the creditors in bankruptcy and the debtor's ability to rehabilitate itself. The fact that the property involved was nonestate property does not obviate the adverse impact and the creditors.

In particular, WHO's actions must be understood as one-half of the scheme it devised with Adelphoi, with each entity contributing separately to obtain the interest of the debtor in its operations of the housing program it developed pursuant to the HUD grant. The partnership between these two entities and their actions in concert resulted in WHO's breach of its fiduciary duty to the members of the unsecured creditors committee. Adelphoi's actions in ensuring the debtor would not respond to HUD's communications regarding a "workable plan" permitted WHO to propose its succession to the grant thereby ultimately allowing it to draw down funds from the grant. The debtor's "failure" to continue with the grant resulted in the addition of three unsecured creditors to that class of creditors thereby diluting possible recovery by all members of the unsecured creditor class.

WHO benefitted from the succession to the grant by receiving grant funds for which it did not have to compete; it also was not required to expend the substantial time and resources normally involved in such competition. Such funds

---

**2.** It is clear that HUD has control over determinations of amendments to their grants and succession to the grants by other entities, but to the extent that WHO's succession was undertaken without notice to the debtor and the unsecured creditors committee, which then would have had the opportunity to object, and approval sought from the Bankruptcy Court, WHO breached its fiduciary duty to its fellow unsecured creditors committee members. Had WHO given notice to the committee and

the debtor and obtained court approval and then begun the process of succeeding the debtor in the HUD grant, the fiduciary duty would not have been breached. Of course, had HUD obtained solicitation from another entity not involved in the bankruptcy litigation and approved that entity's succession to the grant, the Bankruptcy Court would have had no power to stop such succession as the HUD grant is nonestate property.

received by WHO, specifically the operating costs to be paid out under the grant, could have been added to the debtor's estate if WHO had not succeeded the debtor. WHO may argue that such actions were taken in pursuit of legitimate business interests on its part in that the property was not part of the debtor's estate, and while such a contention would be correct in certain circumstances, WHO's actions with that property were taken to the detriment of the debtor and WHO's fellow unsecured creditors while WHO was a member of the unsecured creditors committee. Being a member of the unsecured creditors committee, WHO owed a fiduciary duty to the committee members to inform them of the status of the HUD grant, its possibility of continuation under the debtor's control, its possibility to infuse cash into the debtor's estate and the possibility to avoid the filing of claims by three unsecured creditors by assisting the debtor in continuing with the HUD grant. WHO's intention to succeed the debtor in the HUD grant triggered the need to make such a disclosure, and made that disclosure mandatory, due to the existence of the fiduciary duty. Disclosure is required as a result of the existence of the previously discussed intracommittee fiduciary duty by the fact that the actions to be taken with nonestate property would affect the ability of the general unsecured creditors to recover on their claims. To ensure the committee fulfills its fiduciary duty to its class of creditors requires that the committee members be candid and deal fairly among each other. Without such openness between committee members, the committee becomes ineffectual in its representation of its constituents. Had WHO revealed its plan to succeed the debtor and sought permission of the committee, the committee as a whole, save WHO, could have determined if WHO's succession would benefit, not harm the estate and the committee's constituents, and under those circumstances succession may have been permitted by the Bankruptcy Court for an interested party in the Bankruptcy litigation.[3] Such a decision is for the committee and not one for an interested/conflicted committee member alone.

Moreover, had WHO not possessed the intent to partner with Adelphoi and succeed the debtor in the grant, but rather had learned of Adelphoi's scheme through other means, WHO's membership on the unsecured creditors committee should have caused it to bring that information to the attention of the committee as a whole so that the committee could take necessary actions, including possibly bringing an adversary action, to prevent the dilution of claims of the committee's constituents. Whether WHO would have an obligation to disclose under such a hypothetical situation as a result of a fiduciary duty is not an issue before the Court.[4]

██ Therefore, the Court concludes that the requirements of notice and opportunity to object must be given by a committee member to all of its fellow committee members when it seeks to deal with

---

3. The Court believes that committee approval should be sought first under such a situation. If such approval is granted by the disinterested members of the committee, court approval should then be sought by the conflicted committee member. However, such procedure for ensuring compliance with the fiduciary duty the Court finds today is not directly presented as an issue before us and the Court does not wish to set forth any further proposals for compliance with this intracommittee fiduciary duty.

4. Theoretically, under such a situation, a member of an unsecured creditors committee would take such action to disclose such information even in the absence of a fiduciary duty if only for the sake of its own interest in not having recovery under its claim diluted.

nonestate property of the debtor where the dealings with such property could impact in any manner, negatively or positively, upon the recovery of the creditors in Bankruptcy. If the disinterested committee members approve the interested committee member's proposal for the nonestate property, approval of the bankruptcy court must be sought and obtained before the interested committee member may deal in the nonestate property. Should dealings with the nonestate property clearly have no potentiality to affect the recovery of creditors, approval of the committee and the court may be unnecessary while notice to the committee would appear to still be required in order for the disinterested committee members to conduct their own analysis of the effect of the interested member's actions; such is not an issue before the Court, so this matter need not be addressed further.

Finally, the Court will address WHO's fourth and fifth arguments together. These two arguments can be summarized as follows: WHO cannot be found liable even if a fiduciary duty is imposed upon it as a committee member because the committee knew of WHO's intent to acquire the grant, the lack of harm resulting from its succession to the grant and the absence of monetary damages from that succession. Appellant's Brief, pp. 17–21. The Court disagrees. As found previously, the committee was not aware of WHO's intent to succeed the debtor in the grant. In addition, contrary to WHO's argument, harm did result from WHO's succession. WHO claims that the sale of the debtor's real property at 49 Division Street for $304,000 could not have been "realized" if the debtor "retained the grant"; the claims for matching funds were a result of the debtor's default under the grant, but these claims are less than the $304,000 from the sale of the debtor's Division Street property. Appellant's Brief, p. 18. WHO also

argues that its succession benefitted the estate because of WHO's payment of relocation claims filed in the bankruptcy action from the grant funds drawn down by WHO; and WHO's succession also permitted avoidance of the recapture by HUD of previously received funds given to the debtor because WHO's presence filled a void left by the debtor's failure to continue with the grant. Appellant's Brief, pp. 18–19, 20.

First, WHO's claim to credit for the infusion of $304,000 into the estate is misplaced; Adelphoi, its partner in the surreptitious succession of the debtor's grant, "contributed" the $304,000 to the estate by its actions in facilitating the court-approved sale of the Division Street property under its scheme with WHO. The Court determines that the actions of Adelphoi, which resulted in the infusion of $304,000 into the estate, cannot be attributed to WHO. Therefore, WHO's argument that its actions caused such an infusion of funds, while supportive of the factual conclusion that WHO and Adelphoi were conspiring, does not accurately describe the origin of the $304,000. WHO's actions played no direct part in the profit from the realty transaction. The actions of WHO did not benefit the estate, but damaged it. Had the debtor been permitted by its Adelphoi-elected board to continue with the grant, the recapture claim by HUD and general unsecured claims of the three matching grantors would have never materialized as a result of the filing of the bankruptcy petition. It is correct that the relocation claims would have had to have been paid by the debtor just as WHO paid such claims. However, the amount of $51,399, the amount allocated to WHO for administrative services under the grant (for which it did not expend substantial time and resources to acquire), would have been received by the debtor along with

further payments through draw downs from the grant monies for client services originally totaling $648,645 for the life of the grant. See Trustee's Exhibit 14, Transcript of 11/9/98 hearing. (Bankruptcy Docket No. 12).

In viewing what actually occurred, WHO's actions did prevent HUD's recapture of funds, provided for the payment of relocation claims from the grant monies, but resulted in three general unsecured claims totaling $84,254 being included in the claims made under the bankruptcy proceedings. This amount was a result of WHO's succession to the HUD grant and its decision thereafter not to continue the use of the grant funds for the Division Street location. *Walsh v. Westmoreland Human Opportunities,* Adversary No. 98–2082–BM, slip op. at 21 (Bankr.W.D.Pa. April 23, 1999)(Bankruptcy Docket No. 18). WHO's release of its own claim in the bankruptcy proceedings totaling $5,866.67 does not eliminate these three unsecured claims. See Appellant's Brief, p. 20. Therefore, WHO's actions resulted in a net increase in the amount of unsecured claims in the amount of $78,387.33. Had the debtor retained administration of the grant, even after its Adelphoi-controlled board's sale of the Division Street property, the debtor could have avoided the recapture claim, paid the relocation claims from grant monies, avoided the filing of the $84,254 in matching fund claims, and could have drawn down the $51,399 for administrative services while incurring the relatively small WHO claim of $5,866.67 for its administrative services previously preformed.[5]

The "bottom line" of each of the scenarios demonstrates the monetary damages resulting from WHO's succession to the grant as compared to the debtor's continuance as the grant administrator. Therefore, the amount of $51,399 which the Bankruptcy Court found to be damages in the case *sub judice* resulting from WHO's succession to the HUD grant is found by this Court to be the correct measure of damages as this money would have been paid to the debtor. However, the Court views the additional unsecured claims equaling $84,254 should have been treated differently by the Bankruptcy Court than the $51,399 in terms of assessing damages.

■ Specifically, the additional three unsecured claims amounting to $84,254 will result in a decrease in the amount of recovery ultimately obtained by the other members of the unsecured creditors class, however, the Court is without knowledge of the actual amount of that decrease. The addition of the three matching fund grantors as unsecured creditors clearly enlarged the membership of the unsecured creditors class, thus lowering the amount of recovery for each of the claims of the other unsecured creditors. Still, WHO never utilized the $84,254; it was spent by the debtor previously in its efforts to purchase the real estate and refurbish it in accordance with the HUD grant. *Walsh v. Westmoreland Human Opportunities,* Adversary No. 98–2082–BM, slip op. at 4 (Bankr.W.D.Pa. April 23, 1999)(Bankruptcy Docket No. 18); *Walsh v. Westmoreland Human Opportunities,* 279 B.R. 504, 507 (Bankr.W.D.Pa.2002). This is in contrast to WHO directly receiving $51,399 from the HUD grant. Clearly WHO re-

---

5. The record indicates the new owner of the Division Street property was willing to continue the grant's operation at that address but WHO refused to continue at that location. There is nothing in the record to create doubt that the new owner would not have also wanted the grant to continue in that location had the debtor remained in charge of the grant administration.

ceived and utilized the $51,399 for its benefit. *Id.* at 514. However, WHO did not receive the $84,254 and did not house individuals at the 49 Division Street property, the property upon which such money was expended, after it succeeded to the HUD grant. *Id.* at 508–509. Therefore, WHO's actions which resulted in three additional unsecured creditor claims being filed did not result in damages to the estate in the amount of those three claims. Rather, the Court views the damages resulting from WHO's actions, which added three more unsecured creditors (Westmoreland County Housing Authority, United Way, and the Richard K. Mellon Foundation) to the unsecured creditors class, as being the amount of reduction in recovery incurred by the other members of the unsecured creditors class resulting from the enlargement of that class by the addition of these three unsecured creditors. The Court is without knowledge as to what the actual amount of reduction in recovery is, therefore, this case will be remanded to the Bankruptcy Court for this determination.

**AND NOW,** this 29th day of July, 2005, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Order of the Bankruptcy Court dated June 20, 2002 is AFFIRMED IN PART as to the Bankruptcy Court's determination that Westmoreland Human Opportunities, Inc. breached a fiduciary duty and as to the assessment of $51,399 in damages against Westmoreland Human Opportunities, Inc.; and REVERSED IN PART as to the assessment of $84,254 in damages against Westmoreland Human Opportunities, Inc.; and this matter is REMANDED to the Bankruptcy Court for a determination of the proper damages resulting from the breach of fiduciary duty by Westmoreland Human Opportunities, Inc. which caused Westmoreland County ˙ Housing Authority, United Way and Richard K.

Mellon Foundation to become members of the general unsecured creditors class and thereby reduce the recovery allocated to the other members of that class.